Sidney **DANIELSON**, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

**UNITED SEAFOOD WORKERS SMOKED FISH & CANNERY UNION, LOCAL 359—AFL–CIO,** Respondent.

No. 75 Civ. 5502.

United States District Court, S. D. New York.

Dec. 17, 1975.

National Labor Relations Board by Raymond P. Green, Alexander P. Rosenberg, New York City, for petitioner.

Parker, Chapin & Flattau, by John E. Jay, B. Michael Thrope, New York City, for M. Slavin.

Jackson, Lewis, Schnitzler & Krupman, by Gregory I. Rasin, David Kreitz-

man, New York City, for Huntington Fish Supply, and others.

Hall, McNicol, Marett & Hamilton, by Donald G. McCabe, New York City, for respondent.

## AMENDED OPINION

ROBERT L. CARTER, District Judge.

### 1. *The Nature of the Proceedings*

This proceeding is before the court on the petition of Sidney Danielson, Regional Director of the Second Region of the National Labor Relations Board (Board) pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C. Sec. 160(*l*), for a preliminary injunction pending the final disposition of unfair labor practice charges within the meaning of Section 8(b)(4)(i)(ii)(B) of the Act, 29 U.S.C. § 158(b)(4)(i)(ii)(B) filed with the Board by M. Slavin & Sons, Ltd. (Slavin), Huntington Fish Supply (Huntington) Inc., Two Cousins Fish Market, Inc. (Two Cousins). Ralph Fiori and Fiorentino Fiori d/b/a Fiori Brothers Fish Dealer (Fiori), B&B Fish and Clam Co. (B&B), Sunrise Seafood Inc. (Sunrise) and Quality Fish Co. (Quality)—the charging parties—against United Seafood Workers Smoked Fish & Cannery Union, Local 359, AFL–CIO. The unfair labor practices charged are secondary boycotts and other secondary pressures to force the charging parties to cease doing business at the New York Fulton Fish Market (Fulton) or to require the charging parties to recognize or bargain with Local 359 as representative of their employees.

The petition was filed in this court on November 5, and on the same day a temporary restraining order was signed prohibiting respondents from inducing any employees of the charging parties to engage in a strike and also prohibiting them from inducing the fish wholesalers or purveyors at Fulton to refuse to do business with the charging parties. In its original form the effective termination date of the order was November 10.

Since November 8th and 9th were an intervening Saturday and Sunday and November 11th was a holiday, which pursuant to Rule 6, F.R.Civ.P. are excluded from computation when the temporary restraining order is less than seven days, the order was modified to extend to November 13th. An answer to the petition was filed on November 10th.

### 2. *The Evidentiary Facts*

On November 11th and 12th, an evidentiary hearing was held. The petitioner, the charging parties and the respondent were afforded a full opportunity to be heard and to present evidence and argument bearing on the issues in dispute in respect of both the facts and the law.

The pertinent facts follow. Local 359 is an unincorporated labor organization and the collective bargaining representative of employees of Newport Fish Co. (Newport), Caleb Haley Fish Co. (Caleb Haley), Frank W. Wilkinson Co. (Wilkinson), Joe Monani Fish Co. (Monani), BLCF, Inc., a/k/a Beyer Lightning (Beyer), Lockwood & Wynant Fish Co. (L&W), Blue Ribbon Fish Co. (Blue Ribbon), R. J. Cornelius (Cornelius), Booth Fisheries (Booth), T&S Fish Co. (T&S), LaRocca Fish Co. (LaRocca), C. J. Wadman, Inc. (Wadman), Commercial Fish & Lobster, Inc. (Commercial), M. P. Levy Fish Co. (Levy), Royal Fish Co. (Royal), Joseph H. Carter (Carter), ACA Fish Distributors, Inc. (Distributors), Strand Fish Co. (Strånd), Messing Fish Co. (Messing), T. G. Fish Co. (T.G.), Orient Point Shellfish Co. (Orient), Crown Fish Co. (Crown) and Benny's Express (Benny's). All are purveyors and dealers in the wholesale fish industry in and around Fulton and except for Distributors and Benny's, are, together with other purveyors and dealers, parties to a collective bargaining agreement with Local 359. The employees of the above purveyors and dealers, with the exceptions indicated, whose duties encompass the movement of fish from their respective employer to customers, including handling, delivery,

loading and unloading, have been and are members of Local 359 and have been and are represented by Local 359. No dispute exists between any of the employees so represented and the employers and dealers who are parties to the collective agreement and no dispute exists between these aforesaid employers with any other persons at Fulton or with Local 359 in respect to any terms and conditions of employment of any of the employees working at Fulton represented by Local 359. The membership in Local 359 totals some 850–900 members, 700 of whom are employed at the Fulton Market.

All of the charging parties are engaged in the wholesale and retail fish industry, with gross sales last year ranging, for example, from $1 million for Huntington to $12 million for Slavin. Last year each bought more than $50,000 worth of fish from outside New York and roughly at least one-third of its purchases from Fulton. Each of the charging parties is a non-union operation, and no union is certified by the Board to represent any of the employees of any charging party.[1]

Carmine Romano, Secretary-Treasurer and Business Agent for Local 359 and Anthony O'Connor visited Two Cousins, Huntington, and Fiori in October, 1974, and spoke to management about signing up with Local 359. In each instance they were advised that the decision was for the employees to make, not management. Romano and O'Connor were given the opportunity to talk to the employees of these three charging parties. They either accepted the opportunity and spoke to the men or they refused to do so. In any event, there was no movement by the employees to seek representation by Local 359. When asked to sign up with Local 359 as their employees' bargaining agent without the consent of their employees, Two Cousins, Huntington and Fiori declined. In the summer of this year, at a dinner meeting, Romano gave Herbert Slavin of Slavin a union recognition contract. Slavin offered Romano the opportunity to meet with his employees but this was declined.

Fulton operates Monday through Friday. It opens for business at roughly 4 a. m. The charging parties and others interested in buying fish wholesale at Fulton arrive at the market at 4 a. m., park their trucks in designated areas, go to the stands of the various purveyors and dealers, select the fish they wish to purchase; the fish is then marked as sold to them. At 5 a. m. on Monday and Friday and 6 a. m. on Tuesday, Wednesday and Thursday these purchases may be delivered to the designated parking areas and loaded on the purchasers' trucks. At about the time for delivery the parties return to the various stands to receive their supplies. Journeyman employees—all members of Local 359—take the supplies in hand trucks to the designated areas. There loaders—all members of Local 359—load the supplies onto the trucks.

Action against the charging parties began on October 30th lasting through the dates of the hearing. Representatives from each of the charging parties arrived at Fulton on October 30th and one or more thereafter on October 31, November 3, November 5, November 6, November 7, but with few exceptions no journeyman would deliver the fish they had bought, and if delivered no loader would load it onto the truck. A typical example of the pattern currently in effect against the charging parties is the experience of Herbert Slavin. He testified that he arrived at Fulton at about 4 a. m. on October 31, went to T.G., Caleb Haley, and Blue Ribbon and ordered fish. When he sought to have it delivered, he was told that the journeymen would not deliver and that he had to get the union problem straightened out. On November 3, he returned to Fulton, purchased fish at Carter, Blue Ribbon and

---

1. The charging parties are engaged in commerce; the wholesalers and distributors at Fulton and the Union are engaged in business affecting commerce.

Newport. Again, the journeymen refused to deliver the fish to his truck. At times Slavin sought, sometimes successfully to deliver and load the fish by having his employees do the work of the union journeymen and loaders. In these cases, Romano and O'Connor would order all the union employees of the purveyor who had sold the fish to Slavin to cease work. This action was concerted and uniform, and there was no deviation in the pattern. When on November 5th and thereafter Slavin sought to have his fish delivered under the terms of the court's temporary restraining order, crowds of workers shouting obscenities would gather and physically obstruct the attempted delivery. On occasions the fish was delivered to trucks and loaded by union employees. On at least one such occasion O'Connor ordered the men to unload the trucks and take the supplies back. On another occasion Louis DeMeo, Local 359's President, personally unloaded fish which had been put on the Two Cousins' truck. At times when Slavin undertook to take his own supplies, Romano and O'Connor would order work stoppages by the purveyor from whom Slavin had purchased supplies.

The court's temporary restraining order was served on O'Connor and Romano on November 5th. The last union meeting was held on October 22nd. No meeting was called to explain to the members the court's order. Although there is testimony that Romano told the men to load the fish of the charging parties and they refused, neither he nor any other union official took any action to explain to the men the nature of the court's order and no disciplinary action was taken against the men involved. By contrast, when Slavin or any other charging party would seek delivery through self-help, Romano and O'Connor were swift to retaliate against the purveyor or wholesaler who sold the fish by calling a strike or work stoppage or by threatening the purveyor with such consequences if Slavin were allowed to deliver his own fish.

### 3. Determination

■ Under Section 10(l)[2] of the Act when the Board seeks a preliminary injunction to prevent violations of 8(b)(4)(i) and (ii)(B) prohibiting secondary boycotts and other forms of secondary pressure, the function of the court "consists of determining (1) whether the temporary injunctive relief would be 'just and proper' in terms of general equitable principles and (2) whether there is 'reasonable cause' for the Regional Director 'to believe such [unfair labor practice] charge is true and that a complaint should issue . . . .'" *McLeod v. Local 25, International Brotherhood of Electrical Workers, AFL–CIO*, 344 F.2d 634, 638 (2d Cir. 1965). *Danielson v. International Brotherhood of Electrical Workers, Local Union No. 501, AFL–CIO*, 509 F.2d 1371, 1375 (2d Cir. 1975); *Danielson v. Local 275, Laborers Int'l Union of North America, AFL–CIO*, 479 F.2d 1033, 1035–36 (2d Cir. 1973).

2. Section 10(l) provides in pertinent part:
    (l) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 8(b), or section 8(e) or section 8(b)(7), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States . . . within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law. . . ."

The first part of this test gives the court discretion to grant or deny a preliminary injunction as the situation demands, and "does not mandate the preliminary injunction simply because the District Court concludes that the Regional Director has reasonable ground to believe that an unfair labor practice has occurred." *Danielson v. Local 275, supra*, 479 F.2d at 1036. Under the second part of the test, the court must determine "whether the Board has come forward with evidence sufficient to spell out a likelihood of violation." *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U.*, 494 F.2d 1230, 1243 (2d Cir. 1974), quoting *Douds v. Milk Drivers & Dairy Employees Union, Local 584*, 248 F.2d 534, 537 (2d Cir. 1957).

In answer to the substantial charges that there has been a pattern of refusals by wholesalers and others to deal with the charging parties, respondent has contended that these actions are merely those of individuals, and do not involve the union. Therefore, respondent argues, no preliminary injunction should lie against the union.

A union is responsible for the mass action of rank and file members as long as it is a functioning entity. *Wagner Electric Corp. v. Local 1104, Int'l Union of Elec., Radio & Machine Workers*, 496 F.2d 954, 956 (8th Cir. 1974); *Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446, 455 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); *National Labor Relations Board v. United Mine Workers of America, District 31*, 190 F.2d 251, 252 (4th Cir. 1951); *Adley Express Co. v. Highway Truck Drivers Local 107*, 349 F.Supp. 436, 443 (1972), *reaff'd* 365 F.Supp. 769, 771 (E.D.Pa. 1973); *United States v. International Union, United Mine Workers of America*, 77 F.Supp. 563, 566 (D.D.C.1948), *aff'd*, 85 U.S.App.D.C. 149, 177 F.2d 29, *cert. denied*, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949). The rationale for the mass action theory has been described as follows:

"When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members. *Wagner Electric Corp. v. Local 1104, Int. U. of E., R. & M. W.*, 8 Cir. 1974, 496 F.2d 954, 956; *Vulcan Materials Co. v. United Steelworkers of America*, 5 Cir. 1970, 430 F.2d 446, 455, *cert. denied*, 1971, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247; *United Textile Workers of America v. Newberry Mills, Inc.*, W. D.S.C.1965, 238 F.Supp. 366, 373; *Portland Web Pressmen's Union v. Oregonian Publishing Co.*, D.Or., 188 F.Supp. 859, 866, *aff'd on other grounds*, 9 Cir. 1960, 286 F.2d 4, *cert. denied*, 1961, 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237; *United States v. International Union, U.M.W. of A.*, D.C.D.C.1948, 77 F.Supp. 563, 566–567, *aff'd on other grounds*, 85 U.S. App.D.C. 149, 177 F.2d 29, *cert. denied*, 1949, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535." *Eazor Express Inc. v. Teamsters*, 520 F.2d 951, 963 (3d Cir. 1975).

A union can also be held responsible for the actions of its officers and members under ordinary doctrines of agency. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Mason-Rust v. Laborers' Int'l Union, Local 42*, 435 F.2d 939, 943 (8th Cir. 1970). Section 2(13) of the N.L.R.A., as amended, provides as follows:

"(13) In determining whether any person is acting as an 'agent' of another person so as to make such other

person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

"In other words, the acts of a union agent committed within the scope of his general authority is binding upon the union regardless of whether it was specifically authorized or ratified." *Vulcan Materials Co. v. United Steel Workers of America, supra,* 430 F.2d at 457.

■ The attempt to pass off the concerted union refusal to handle any of the purchases at Fulton made by the charging parties and to prevent their securing delivery of any produce from Fulton as the spontaneous action of individual union members, is simply not to be credited. There was testimony that some of the men met (about seven) and decided not to deal with the charging parties as non-union organizations. Somehow this decision by seven was transmitted through wave lengths of one kind or another to all the other 700 or so employees, who decided to take similar action. As the finder of fact, this version of what and how the events took place does not have the ring of truth and is rejected. Hence, I place responsibility on Local 359. *Eazor Express, Inc. v. Teamsters, supra,* 520 F.2d at 963. However, even if I were to accept the attempted freeze-out of the charging parties from Fulton as the spontaneous action of individual members of the union, the result would be the same since the union must take responsibility for what on this record amounts to the mass action of its rank and file members under respondent's version of the events. *See Vulcan Materials Co., supra,* 430 F.2d at 455. Even if there were less evidence of the involvement of union officials in these events, the union can still be held liable for the activities of its members.

"A union is required to use its best efforts to return striking workers to their jobs if it is not to be held responsible for their actions. *Vulcan Materials, supra,* 430 F.2d at 457;

*United States v. United Mine Workers, supra,* 177 F.2d at 39 [sic]; *Eazor Express Inc. v. Teamsters Local 249,* 357 F.Supp. 158, 163–165 (W.D. Pa.1973); *Adley Express, supra,* 349 F.Supp. at 444." *Wagner Electric Corp. v. Local 1104, International Union of Electrical, Radio and Machine Workers,* 496 F.2d 954, 956 (8th Cir. 1974).

"Mere failure to take substantial steps to get the membership back to work can constitute sufficient union involvement in the illegal strike to sustain its liability." *Adley Express Co. v. Highway Truck Drivers & Helpers, Local 107,* 365 F.Supp. 769, 771 (E.D.Pa.1973).

■ For more than two weeks there have been activities at the Fulton Fish Market that may fairly be characterized as a secondary boycott under the Act. During that time the union has not disavowed the actions of its members or ordered its members to cease these activities. It is fair to conclude, that whatever the involvement of the union has been or continues to be, the union members must feel that they have the unspoken approval of the union. In *McLeod v. Local 25, Electrical Workers (IBEW),* 50 Labor Cases ¶ 19,201 at 32,-301 (E.D.N.Y.1964), Judge Mishler concluded on similar facts that the N.L.R.B. "may reasonably infer tacit authorization from respondent's knowledge of the circumstances of the many stoppages and leaving of jobs by members." The object of the activities of Local 359 against the charging parties has been to require the various purveyors and dealers in the wholesale fish industry doing business at Fulton to cease trading with the charging parties as a means of pressuring the latter into dealing with Local 359 as the bargaining agent for their employees. However, Local 359 has not been certified as such bargaining representative by the Board, and the charging parties have not attempted to prevent representatives of Local 359 from seeking to persuade employees to join Local

359 and have it certified as their representative.[3]

From October 30th to the present, the charging parties have been either unable to purchase or have delivered any fish or such few supplies as not to meet their needs and those of the charging parties who sell produce at Fulton have also been unable to do business during the same period. This has been the situation despite the court's temporary restraining order and its notice and publication to Romano, DeMeo, O'Connor, various purveyors and wholesalers. Some of the charging parties face the imminent peril of business ruin and all face that eventual catastrophe if respondent continues on its present course. Thus, immediate irreparable injury to the charging parties has already occurred and will continue in the future unless respondent is enjoined.

Moreover, violations of Section 8(b)(4)(i)(ii)(B) of the Act established on this record are surely likely to continue unless enjoined. Accordingly, Local 359 is enjoined and restrained pending final disposition of the issues now before the Board, from continuing the actions found herein to violate the Act or engaging in any similar activity designed to freeze the charging parties out of Fulton.

4. *Civil Contempt*

■■■ Petitioner in this case has also asked that we find respondent union and two of its officials in civil contempt for failure to obey the court's temporary restraining order of November 5, 1975. The civil contempt power is part of a court's inherent power to enforce its lawful orders. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). A court can im-

pose sanctions, including fines, for disobedience of its orders. *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The constituent elements of a finding of civil contempt are knowledge of the court's order and an ability to comply with that order. *United States Steel Corp. v. United Mine Workers*, 393 F.Supp. 942, 947 (W.D.Pa.1975). No jury trial is needed. *Muniz v. Hoffman*, 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975). Violation of a valid order of the court must be found by clear and convincing evidence. *National Labor Relations Board v. Local 282, International Brotherhood of Teamsters*, 428 F. 2d 994, 1001–02, *vacated on other grounds*, 438 F.2d 100 (2d Cir. 1970). And it is important to note that civil contempt relief is remedial in nature and not punitive, particularly when the penalty is conditioned on a future violation of the court's order. *United States v. United Mine Workers, supra*, 330 U.S. at 302–03, 67 S.Ct. 677, 91 L.Ed. 884 (1947), citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). With penalties for future violations only, it is most obvious that the court is not seeking to punish, but is acting to guarantee compliance with its order. While the evidence is clear and conclusive that Romano and O'Connor were in contempt of the court's temporary restraining order, the court prefers to believe that once the court's findings of fact and conclusions of law and the terms of the preliminary injunction issued in connection therewith are served, respondent and all union officials will comply with the court's order. Hence I see no cause for imposing any penalty at this time. So ordered.

---

3. Pressure of this kind is unquestionably forbidden by Section 8(b)(4)(i)(ii)(B) of the · Act. *Iodice v. Calabrese*, 512 F.2d 383, 388 (2d Cir. 1975).