**In the Matter of KALPANA ELECTRONICS, INC.; Kalpana Indian Groceries & Spices, Inc.; Meena International, Inc.; Kalpana Restaurant, Inc., Debtors.**

**Bankruptcy Nos. 085–50826–21 to 085–50829–21.**

United States Bankruptcy Court, E.D. New York.

Feb. 26, 1986.

M. Thomas Kuriakose, Flushing, N.Y., for debtor.

Douglas J. Pick, New York City, for Alan & Louise Look/Landlord.

CERTIFICATE OF CONTEMPT PURSU-
ANT TO 28 U.S.C. § 157(c)(1)

CECELIA H. GOETZ, Bankruptcy Judge:

TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK:

I, Cecelia H. Goetz, Bankruptcy Judge in the above-entitled case, upon the application of Alan and Louise Look, by their attorney, and after a hearing on due notice to Kalpana Indian Groceries & Spices, Inc. ("Kalpana Groceries"), the Debtor herein, and its President, Harshad Parekh, do hereby respectfully submit the following Proposed Findings of Fact and Conclusions of Law to the United States District Court for the Eastern District of New York:

Alan and Louise Look, (the "Landlord"), the lessors of premises formerly occupied by Kalpana Groceries are seeking to have Harshad Parekh held in civil contempt because of his and the debtor's failure to obey this court's Orders to surrender the keys to these premises to them.

The lessors are requesting that they be awarded damages, costs and the attorney's fees occasioned by this contempt. They seek, in all, an award of $3,462.20.

This is not a core proceeding, but is otherwise related to a case under Title 11. The parties have not consented to letting me hear and determine the issues. Accordingly, 28 U.S.C. § 157(c)(1) requires that the Bankruptcy Court confine itself to submitting proposed findings of fact and conclusions of law to the District Court, who is empowered to enter a final order or judg-

ment after reviewing, *de novo*, those matters to which any party has timely and specifically objected. 28 U.S.C. § 157(c)(1).

The delay in certifying the facts to the District Court is due to the fact that an appeal was taken from the denial by the Bankruptcy Court of the debtor's application to amend the orders which Parekh is charged with disobeying. Since reversal of the underlying orders would have invalidated any sanctions imposed for their violation, (*McLean v. Central States, Southeast and Southwest Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir.1985)), this report was delayed until the appeal was dismissed on January 10, 1986.

## PROPOSED FINDINGS OF FACT

1. Kalpana Groceries filed for relief under Chapter 11 on April 9, 1984.

2. Kalpana Groceries is one of four corporations, all interrelated, of which Harshad Parekh is President, sole stockholder and sole operating officer, all of which have sought relief under Chapter 11.

3. On April 25, 1985, with the acquiescence of the debtors, all four proceedings were converted to Chapter 7 and they are now being jointly administered. Marilyn Frier is the trustee for all four corporations. She has reported that no assets of any value were turned over to her. She has not been made a party to this contempt proceeding and no relief is sought by the Landlord against her or the estate of Kalpana Groceries.

4. Kalpana Groceries was in the business of selling, at retail, Indian foods, spices, fabrics, ethnic goods and small appliances. It carried on this business at 42–75 Main Street, Flushing, New York ("the Premises"), which it leased from Alan and Louise Look. The lease, which began on January 1, 1975, was for a term of ten years, ending December 31, 1984, and the rent during the last year was $2,026.81 per month.

5. Although the debtor's schedules recited that this lease was transferred to Parekh's wife immediately prior to filing, "for salaries due to her, unspecified amount, for the year 1983", on June 25, 1984, Parekh, as President of the debtor, petitioned to assume the unexpired lease and to pay use and occupancy, thus reasserting ownership of the lease in the debtor. (Petition to Assume Unexpired Lease, dated June 25, 1984).

6. The schedules filed by the debtor list among its assets, "store equipment, cash register, shelving, walk-in refrigerator, show cases, weighing scales, etc." of a value of $6,000.00.

7. On April 18, 1984, at the request of the State Bank of India, which had a security interest in the entire inventory of Kalpana Groceries, the Court stayed all sales at retail by Kalpana Groceries and subsequently permitted the State Bank of India to sell the inventory at public auction on June 14th and 15th, 1984.

8. In January, 1985, when the Landlord sought to regain possession of the Premises, the Court first learned that the debtor never resumed operations after the sale held by the State Bank of India and that the retail business conducted on the Premises thereafter belonged to the father of Mr. Parekh, doing business under the name KNP Video.

Examined at the hearing on January 28, 1985, Parekh gave the following testimony:

"PICK: [Landlord's attorney] Were you conducting business in those premises?
PAREKH: No.
PICK: You're not conducting business in Kalpana Indian Groceries & Spices, Inc.?
PAREKH: Me, no.
PICK: Are any of your employees conducting business? Is the business known as Kalpana Indian Groceries & Spices, Inc. today selling goods to the public?
PAREKH: No.
PICK: It's closed?
PAREKH: It's closed."
(Tr. 1/28/85, p. 12)

\* \* \* \* \* \*

"PICK: Who is doing business at 42–75 Main Street currently?

PAREKH: KNP Video Renting.

PICK: KNP Video?

PAREKH: Renting".

(Tr. 1/28/85, p. 19)

\* \* \* \* \* \*

"THE COURT: I also understand that at the present time, and for sometime in the past, there has been no merchandise in the premises, according to Mr. Parekh, belonging to Kalpana Indian Groceries & Spices, Inc. That whatever merchandise there is in the premises belongs to KNP Video Renting company.

KURIAKOSE: [Attorney for Debtor] Yes".

(Tr. 1/28/85, p. 47)

The debtor's own attorney made clear that the debtor had ceased operating after the auction sale:

"KURIAKOSE: Before the Kalpana Groceries & Spices went into liquidation, who was it doing business there?

PAREKH: The debtor.

\* \* \* \* \* \*

KURIAKOSE: And now who is doing the business after the bankruptcy?

PAREKH: My father.

\* \* \* \* \* \*

THE COURT: Who is selling groceries and spices, KNP Video Renting Company?

PAREKH: Yes".

(Tr. 1/28/85, p. 51)

9. The debtor never assigned the lease of the Premises and the Court never authorized either an assignment of the lease to Parekh's father or a sublease to him.

10. Until November, 1984, the Landlord was paid the rent due under the lease. When the rent was due, Look would go to the Premises and receive payment from Parekh. The record does not show the source of these moneys. (Affidavit of Harshad Parkeh, dated January 23, 1985, para. II, in support of Application to Modify Order of January 22, 1985).

11. In November, 1984, Parekh paid Look only $1,000.00 and told him to see his, Look's lawyer, if he wanted more. (Hearing, 1/16/85, untranscribed. See docket entry for that date.).

12. On December 13, 1984, the Landlord moved by Order to Show Cause (1) for relief from the automatic stay imposed by § 362 of the Bankruptcy Code, (2) for immediate possession of the Premises and (3) for payment for use and occupancy.

13. A hearing was held on the Landlord's Order to Show Cause on January 16, 1985, attended by M. Thomas Kuriakose, Esq., the attorney for the debtor and Harshad Parekh; Parekh was not present.

14. At the hearing, the Landlord established the following facts:

A. The debtor's lease had terminated December 31, 1984.

B. No rent had been received for the Premises since November 1, 1984, except $1,000.00.

C. The Premises had been damaged by the occupancy of the debtor.

D. The debtor was no longer doing business at the Premises, but they were being used as a place of business by Parekh's father and as a residence by Parekh's family.

15. Based on these facts, the bankruptcy court, at the conclusion of the hearing, directed the debtor to vacate the Premises and surrender the keys to the Landlord. The debtor was instructed to vacate the portion of the building used for commercial purposes by January 23, 1985, and the balance on January 31, 1985. (Tr. 1/28/85, pp. 46-47, 95).

16. Additional time was allowed as to a portion of the Premises, because at the January 16, 1985 hearing it was first disclosed to the Court that the Premises were being used in part by Parekh's family as a residence. The extra time was given for humanitarian reasons, as to so much of the Premises as were being used as a residence.

17. On January 22, 1985, the Court signed an Order embodying the terms of the decision rendered from the Bench on

January 16th, directing the debtor, *inter alia:*

"to forthwith surrender, vacate and abandon the basement, first floor and second floor of premises located at 42–75 Main Street, Flushing, New York (the "Premises") and turn-over to the Landlord all keys to the respective locks no later than January 23, 1985; and it is further

ORDERED, that the Debtor is to forthwith surrender, vacate and abandon the third floor of the Premises and turn-over to the Landlord all keys to the respective locks no later than January 31, 1985;"

18. Parekh was advised by his attorney, Kuriakose, of the Court's decision on the same day as it was rendered, January 16, 1985. (Tr. 1/28/85, p. 9).

19. Parekh saw the Order, when it was noticed for settlement and was told on January 23, 1985 by the attorney for the Landlord that it had been signed. On January 24, 1985, his own attorney informed him that he had received a conformed copy of the Court's Order. (Parekh's Answer to the Order to Show Cause to Punish him for Contempt, dated January 28, 1985).

20. On January 23, 1985, when Look traveled to Flushing to accept the surrender of the keys, he was met initially by Kuriakose, who told him:

"They are not going to give you the key. They have not yet moved out yet.... Mr. Parekh is on the Island. I am his lawyer. I can tell you that he is not going to give you the key.... If you want, talk to your lawyer." (Tr. 1/28/85, p. 66).

Look then encountered Parekh himself who told Look that he was not going to surrender the keys and volunteered no date by which he would obey the Court's Order. (Tr. 1/28/85, p. 67).

1. Parekh was ordered to:
"show cause ... why he should not be adjudged in contempt for failure to obey the January 22, 1985 Order of this Court and why a fine should not be imposed upon him of

21. Thereupon, on January 24, 1985, the Landlord moved by Order to Show Cause to punish Parekh for contempt of court.[1]

22. On the same day, January 24, 1985, Kalpana Groceries moved, by Order to Show Cause, to delay the date of surrender to February 14, 1985, and for other relief.

23. Both Orders to Show Cause were heard on January 28, 1985. At the conclusion of the hearing, in the presence of Parekh, the Court denied the relief requested by the debtor and Parekh and adhered to the deadlines it had fixed on January 16, 1985. (Tr. 1/28/85, p. 90).

24. The debtor, which had filed no appeal from the Court's Order of January 22, 1985, filed a Notice of Appeal on February 7, 1985 from the decision announced from the Bench on January 28, 1985 denying its application to modify the earlier Order. This appeal was dismissed by the District Court on January 10, 1986.

25. During the course of the hearing on January 28, 1985, the Court commented:

"THE COURT: ... I think this is an outrage. I think it's an outrage that you maintain that you're not doing business there. That your father is doing business there. That your wife has the lease. There is no property there and yet under the cover of this Bankruptcy Court, which applies only to Kalpana Indian Groceries and Spices, Inc., you continue to occupy the place.

Taking advantage of the fact that your landlord has great difficulty in collecting."

(Tr. 1/28/85, p. 86)

The hearing was adjourned to police Parekh's future compliance:

"THE COURT: ... On the Order to Show Cause to punish for contempt, I'm not going to decide that now. I'm going to adjourn that so that we know the entire story. That is, I want to adjourn that so I know when I decide it just when

$1,000 together with the costs and expenses of this proceeding and attorneys fees pursuant to Section 105 of the Bankruptcy Reform Act of 1978...."

it was that your client did leave the premises. There is no point in punishing for contempt, and having another application to punish for contempt and another application to punish for contempt. I want to have the total picture before me.

Therefore, I'm going to put that application to punish for contempt over and see what your client does in the meantime, what Mr. Parekh does in the meantime to remove himself from those premises, and to make the keys available to the landlord."

(Tr. 1/28/85, p. 90–91)

26. Following the January 28th hearing, Look went daily to the Premises to obtain the keys from Parekh. On February 5, 1985 Parekh gave him the keys only to the first floor and on February 10, 1985 those to the balance of the building. (Tr. 8/14/85, p. 11–12).

27. Until January 31, 1985, Parekh's father continued to conduct his retail business in the Premises. (Tr. 8/14/85, p. 57–58).

28. Parekh's testimony with respect to what property of the debtor was moved out prior to the hearing on January 28, 1985 is internally inconsistent and is entitled to no credence.[2]

29. At the hearing on January 28, 1985, Parekh claimed to need no more than two days to move the debtor's property out of the Premises. (Tr. 1/28/85, p. 43).

30. The debtor at all times had the ability to comply with the directions of the Court to surrender the keys to the commercial portion of the Premises by January 23,

1985 and the balance no later than January 31, 1985.

31. Parekh withheld the keys to the Premises for the benefit of himself, his father and his family and not to protect the property of the debtor. He acted voluntarily with knowledge that he was disobeying the Orders of the Court.

32. Look incurred expenses of $138.50 for traveling and parking on his trips to Flushing between January 27, 1985 and February 10, 1985 to collect the keys from Parekh. (Tr. 8/14/85, p. 19–20).

33. Because of Parekh's failure to vacate, the Landlord was unable to deliver the Premises to a new tenant until after February 10, 1985 and lost rent in the amount of $1,285.70. (Tr. 8/14/85, p. 20–21).

34. The Landlord has incurred attorneys' fees of $1,200.00 for the prosecution of this contempt proceeding. (Tr. 8/14/85, p. 22).

35. The contempt hearing, which began on January 28, 1985, was repeatedly adjourned, and did not conclude until August 14, 1985. The bulk of these adjournments were requested by Parekh or his attorney, often on the very day of the hearing and on flimsy excuses, and after Mr. and Mrs. Look were present in court. These repeated adjournments, together with their timing, caused unnecessary delay and a needless increase in the cost and burden of the litigation to the Landlord.

36. Mr. and Mrs. Look incurred expenses for traveling and parking of $118.00 in attending the contempt hearing at the

---

**2.** During the hearing on January 28, 1985, Parekh made the following statements:

  1. That 50 percent of the debtor's property was already packed and was going to be moved out that day. (Tr. 1/28/85, p. 4);

  2. That only 30 percent of the debtor's property was packed, but that 20 percent had already been moved and another 20 percent was going to be moved. (Tr. 1/28/85, p. 5);

  3. That 30 percent of the property had already been moved. (Tr. 1/28/85, p. 6);

  4. That the 30 percent of the property which was packed was "the residential stuff", not the debtor's property. (Tr. 1/28/85, p. 28);

  5. That the 30 percent of the personal effects that had been packed would be moved that day. (Tr. 1/28/85, p. 28);

  6. That it would take no more than two days to move the remaining property of the debtor off the Premises. (Tr. 1/28/85, p. 43–44);

  7. That it would take six to seven days to move out. (Tr. 1/28/85, p. 7);

  8. That all the furniture and fixtures were to be moved out that afternoon. (Tr. 1/28/85, p. 45).

courthouse in Brooklyn. (Tr. 8/14/85, p. 18–20).

37. Mr. Look lost $720.00 in salary for four days because of his attendance at the contempt hearing. (Tr. 8/14/85, p. 21–22).

## DISCUSSION

### I

The cases are currently divided respecting the extent of the contempt power of a bankruptcy judge, if any, and the constitutionality of any such power. This uncertainty is due to the limitations on the powers of a non-Article III court, which formed the *ratio decidendi* of *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (*"Marathon"*) and to the statutory changes enacted subsequent to the *Marathon* decision, having as their purpose to reconstitute the bankruptcy court within those limitations, the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Public Law No. 98–353, 98 Stat. 333) (the "1984 Amendments").[3]

Several decisions have denied any contempt power to the bankruptcy courts on the ground that such power cannot be given a non-Article III court. *In re Cox Cotton Co.*, 24 B.R. 930, 956 (E.D.Ark.1982), *vacated sub nom, Lindsey v. Ipock*, 732 F.2d 619 (8th Cir.1984), *cert. denied sub nom, Cryts v. French*, —— U.S. ——, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984); *Martin-Trigona v. Shiff*, 19 B.R. 1001 (D.C.Conn. 1982), *rev'd on other grounds*, 702 F.2d 380 (1983);[4] *In re Omega Equipment Corp.*, 51 B.R. 569 (D. of C. 1985).

There is, however, contrary opinion. *In re Johns-Manville Corp.*, 26 B.R. 919 (Bankr.S.D.N.Y.1983); *In re Better Homes of Virginia, Inc.*, 52 B.R. 426 (E.D.Va. 1985). Judge Lifland in *Johns-Manville* found "nothing unconstitutional in the grant of a contempt power to the bankruptcy court", adding "there is inherent in the power of every court the power to stay proceedings in order to control the disposition of cases on its docket". Judge Lifland went on to say: "... any conduct which disrupts or threatens the inherent power of a court to control proceedings or to maintain the dignity and efficiency of the judicial process should in the first instance be punished by that court". *In re Johns-Manville Corp.*, 26 B.R. at 924.

The contention that only an Article III court can exercise civil contempt power appears to overlook the fact that even prior to the adoption of the Bankruptcy Reform Act of 1978, Public L. No. 95–598, 98 Stat. 2683 ("1978 Reform Act"), bankruptcy judges, under the Rules promulgated by the Supreme Court exercised contempt power, albeit limited in scope. Under Rule 920, promulgated in 1973 (411 U.S. 989, 93 S.Ct. 3100, 37 L.Ed.2d lxxix), a bankruptcy judge could impose a maximum fine of $250.00 for either civil or criminal contempt. The investiture of this authority in the bankruptcy court was not the product of inadvertence since it was objected to vigorously at the time by Mr. Justice Douglas. 411 U.S. at 994, 93 S.Ct. at 3083, 37 L.Ed.2d xxxii.

In the new Bankruptcy Rules implementing the Reform Act, effective August 1, 1983, issued subsequent to *Marathon*, by the same court as had decided *Marathon*, bankruptcy courts were recognized as having the same power to punish for civil

---

3. An authoritative decision in this area may shortly be forthcoming. The Court of Appeals for the District of Columbia is currently considering the jurisdiction of a bankrupcty judge to issue a contempt citation and has invited memoranda of law from *amici curiae. In re William L. Magwood, III*, 785 F.2d 1077 (D.C.1986) (*"Magwood"*). In that case, the Department of Justice has intervened in defense of such jurisdiction. However, because the *Magwood* case arose while the Emergency Rule was in force, whereas the present case is governed by the 1984 Amendments, open questions may remain even after it is decided.

4. In *Martin-Trigona v. Shiff, supra,* the Court of Appeals for this Circuit, significantly observed that "the broad language of the Court's [*Marathon*] opinion raises doubts as to the constitutionality of 28 U.S.C. § 1481 (Supp. IV 1980)." 702 F.2d at 383–84 n. 8. It is § 1481 that confers on bankruptcy courts unrestricted civil contempt power.

contempt as the district courts enjoyed. Bankruptcy Rule 9020, which superseded Rule 920, applies only to criminal contempt proceedings. The Note of the Advisory Committee explained the absence of any reference to civil contempt as due to the fact that the decisional law governing the procedure for imposition of civil sanctions by the district court would be equally applicable to the bankruptcy courts. Under Rule 9020, the bankruptcy judge is required to certify only criminal contempt to the district court and then only if he lacks power to punish or to punish appropriately.

The Department of Justice, as an intervener in the *Magwood* case, flatly takes the position that a non-Article III judicial officer may constitutionally exercise contempt power:

"There is nothing untoward about investing a non-Article III judicial officer with the power to compensate on party for another's failure to abide by an order of the court, and there is nothing surprising about investing an adjunct of the Article III district court with a limited power to coerce compliance with prior orders. Brief for the United States, p. 9."

Assuming, therefore, that there is no constitutional impediment to the exercise of civil contempt power by this Court, where is the authority for such exercise?

That question was easy to answer before the 1984 Amendments. Prior to those Amendments, the two provisions added to the law by the 1978 Reform Act generally viewed as investing the bankruptcy court with contempt power were Section 1481 of Title 28 and Section 105(a) of the Bankruptcy Code. Section 1481, gave the new bankruptcy court all "the powers of a court of equity, law and admiralty" subject only to the limitation that the court could not enjoin another court or punish a criminal contempt not committed in the presence of the judge or warranting imprisonment. 11 U.S.C. § 105(a) empowered the bankruptcy court to "issue any order, process or judg-

ment that is necessary or appropriate to carry out the provisions of this title". In light of these sections, Bankruptcy Judge Buschman thought the civil contempt power of the bankruptcy court to be "beyond cavil". *In re Damon*, 40 B.R. 367, 374 (Bankr.S.D.N.Y.1984): Accord: *In re Johns-Manville Corp., supra. See also, In re Eisenberg*, 7 B.R. 683, 3 C.B.C. (2d) 440, 453 (Bankr.E.D.N.Y.1980).

Apart from statute, contempt power was also found in a court's inherent power. *In re Jolly Joint, Inc.*, 23 B.R. 395, 402 (Bankr.E.D.N.Y.1982).

It is now doubtful, however, whether 28 U.S.C. § 1481 has survived the 1984 Amendments. This is due to the fact that § 402(b) of the Reform Act, which added 28 U.S.C. § 1481, was amended by two inconsistent sections of the 1984 Amendments. Section 113 of the 1984 Act provided that § 402(b) "shall not be effective", while § 121(a) of the 1984 Act amended § 402(b) to make it effective "on the date of enactment of the 1984 Act". The result has been to leave § 1481 in limbo. *Better Homes, supra,* deems it still in effect; *In re Depew*, 51 B.R. 1010 (Bankr.E.D.Tenn. 1985) does not.[5]

The 1984 Amendments made other changes relevant to the powers of the bankruptcy court. To meet the constitutional problems raised in *Marathon*, the 1984 Amendments cut back radically on the broad jurisdiction previously given the bankruptcy court. 28 U.S.C. § 157, added by the 1984 Amendments, distinguishes between "core proceedings" and non-core proceedings and severely limits the powers of the bankruptcy judge with respect to the latter.

28 U.S.C. § 157(c)(1) provides that a bankruptcy judge may hear a proceeding that is not a core proceeding, but that is otherwise related to a case under Title 11, but that in such a matter the bankruptcy judge is to do no more than submit pro-

**5.** In *In re Wallace,* 46 B.R. 802 (Bankr.W.D.Mo. 1984), the bankruptcy court held that under the 1984 Amendments, the bankruptcy courts have no contempt power, but made no reference to § 1481.

posed findings of fact and conclusions of the law to the district court, which is to enter any final order and judgment after reviewing, *de novo,* those matters to which any party has timely and specifically objected. Only if a matter is a core proceeding may the bankruptcy court make a final determination. 28 U.S.C. § 157(b)(1).

The 1984 Amendments, therefore, complicate the critical inquiry. To the question as to whether a bankruptcy judge has contempt power must be added the question as to whether a proceeding to punish for contempt is a core proceeding or not.

In those cases decided after the 1984 Amendments, in which contempt power in the bankruptcy court has been found, the contempt proceeding has been found to be a core proceeding. *Better Homes of Virginia v. Budget Service Co., supra; In re Depew, supra.* When the contempt proceeding has been determined non-core, contempt power has been denied. *In re Omega Equipment Corp., supra; In re Wallace, supra,* 46 B.R. at 806 n. 6. Whether a contempt proceeding is or is not held to be a core proceeding appears to depend on whether it is deemed to be part of the proceeding giving rise to the contempt or to be wholly independent. If the former, then it, too, is core if the original proceeding was core.

The Department of Justice in the *Magwood* case squarely takes the position that a civil contempt proceeding is properly viewed as a part of the underlying action so that if the underlying order was issued in a core proceeding, the subsequent contempt proceeding will likewise be core. Brief for the Intervener United States, at pp. 10, 15–16.

This was likewise the view of the District Court in *Better Homes of Virginia, supra,* holding that a contempt proceeding, brought to enforce the automatic stay imposed by 11 U.S.C. § 362, was a core proceeding. ("... civil or coercive contempt actions are 'necessary' and 'appropriate' to effectuate 11 U.S.C. § 362; however, criminal contempt actions are necessary only to vindicate the dignity of the court and are

*collateral* to the bankruptcy proceeding".) 52 B.R. at 430. (emphasis in original). The court noted that the core proceeding limitation was inserted primarily to prevent bankruptcy judges from adjudicating state law causes of action and was not intended to exclude civil contempt actions from the bankruptcy court's authority. 52 B.R. at 429.

In *In re Depew, supra,* which also involved a violation of the automatic stay, the bankruptcy court similarly concluded that the proceeding before it was a core proceeding. 51 B.R. at 1013.

By contrast, *In re Omega,* 51 B.R. 569, 574 (D. of C. 1985) held that the trial of a contempt charge is not a restructuring of the debtor-creditor relation, but entails "a wholly collateral factual inquiry into an alleged contemnor's knowledge, conduct and intent" and was, therefore, not a core proceeding.

The courts which, contrary to *Omega,* refuse to view the contempt charge as collateral, appear to be on the sounder ground. The weight of authority is to the effect that a civil contempt proceeding cannot be divorced from its underlying case. *Leman v. Krentler-Arnold Hinge Last Co.,* 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1932); *Gompers v. Bucks Stove and Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). This means that if the underlying matter out of which the contempt arises is "core", then the contempt proceeding is also core.

Assuming, therefore, that the distinction made in the 1984 Amendments between core and non-core proceedings does not necessarily act to deny contempt power to bankruptcy judges, can the courts still claim such power in view of the negation of 28 U.S.C. § 1481. Is there any other source of authority in the bankruptcy court for the exercise of civil contempt powers? The National Conference of Bankruptcy Judges is strenuously arguing in *Magwood,* that contempt powers inhere in the court's authority to hear and determine cases:

"All courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders. No specific statute is required to invest a court with the contempt power. The power is inherent in the authority to hear and determine legal disputes. The power to issue an order carries with it the power to enforce the order. *United States v. Hudson and Goodwin,* [7 Cranch 32] 11 U.S. 32 [3 L.Ed. 259] (1812); *In re Debs,* 158 U.S. 564 [15 S.Ct. 900, 39 L.Ed. 1092] (1895); *Francis v. People of Virgin Islands,* 11 F.2d 860 (3d Cir.1926); *Fleming v. United States,* 279 F. 613 (9th Cir.1922), *cert. denied,* 260 U.S. 752 [43 S.Ct. 10, 67 L.Ed. 496] (1922); *United States v. Talbot,* [15 Alaska 590] 133 F.Supp. 120 (D.Alaska 1955); *In re Jolly Joint, Inc.,* 23 B.R. 395 (Bankr.E.D.N.Y. 1982); 2 *Collier On Bankruptcy,* ¶ 105.-03 at 105–7 (15th Ed.1985). The function of specific legislation is not to confer the contempt ower, but to restrict it. *Michaelson v. United States,* 266 U.S. 42, 66 [45 S.Ct. 18, 20, 69 L.Ed. 162] (1924). Brief of the National Conference of Bankruptcy Judges, *amicus curiae,* at p. 6.

But, the Advisory Committee on Bankruptcy Rules, all bankruptcy experts, charged with recommending amendments to the bankruptcy rules to accommodate them to the 1984 Amendments deny that bankruptcy judges, as mere judicial officers and no longer a court, have either statutory or inherent contempt power. The Committee's Note to the proposed revision of Rule 9020 reads, in relevant part:

### COMMITTEE NOTE

The United States Bankruptcy Courts, as constituted under the Bankruptcy Reform Act of 1978, were courts of law, equity and admiralty with an inherent contempt power, but *former* 28 U.S.C.

**6.** This procedure should avoid any constitutional or due process problems. *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 55–56 (2d Cir.1976), *cert. denied,* 429 U.S. 1093,

§ 1481 restricted the criminal contempt power of bankruptcy judges. Rule 9020 governed the procedure in criminal contempt matters. Bankruptcy judges are *judicial officers* of the district court, 28 U.S.C. § 151 and 152(a)(1), and *there is no statutory authority for them to exercise the contempt power.*

The rule has been amended to provide a procedure for initiating contempt proceedings in the district court. The Rule applies to civil and criminal contempt proceedings. (Emphasis supplied).

The proposed Rule, insofar as relevant, reads:

"Rule 9020 Contempt Proceedings

(a) Motion in District Court. A motion for contempt shall be filed in the district court and served on the party named in the motion.

(b) Certification to District Court. If it appears to the bankruptcy judge that contempt has occurred, the judge may certify the facts to the district court."

In short, it is the view of the Advisory Committee that only the district court has jurisdiction to punish contempt of the orders of the bankruptcy court, civilly or criminally.

■ In view of the present uncertainty in the law, the most prudent course for this Court is to follow the procedure which the Proposed Rule 9020 would require and certify the facts to the District Court, rather than enter the final order which this Court believes it would have the authority to do.[6] No prejudice is done Parekh by this procedure and it should afford Mr. and Mrs. Look a final determination, unclouded by constitutional problems, far faster than if this Court were to use this case as a vehicle to test the boundaries of its power to punish for civil contempt. For this reason, this Court has designated the proceeding not to be a core proceeding.

97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) (no denial of due process in giving contemnors too many opportunities to present their side of the controversy.)

## II

This contempt proceeding is the fruit of an only too common abuse of the bankruptcy laws —the use of Chapter 11, not to rehabilitate a business or to liquidate its assets for the benefit of its creditors, but to hold those creditors at bay while the owner of the business uses its assets for his own benefit, leaving his creditors, as here, with an empty shell when the Chapter 11 proceeding terminates. Filing a petition in Chapter 11 leaves the owner in control of all the assets of the business as a "debtor-in-possession". 11 U.S.C. §§ 1101(1), 1107, 1108. At the same time, the automatic stay imposed by 11 U.S.C. § 362 prevents interference by any creditor with the debtor's property, which includes its unexpired leases.

In June, 1984, after the State Bank of India auctioned off the merchandise belonging to Kalpana Groceries, the debtor still owned a lease with six months to run on both the store where it had conducted its business and on the residence above and it also owned the fixtures in that store. Separately and together, these represented assets, the sale of which might have realized some money for the creditors of Kalpana Groceries. Less than one year later, when a trustee replaced Parekh as the guardian of the interests of the creditors of Kalpana Groceries, the lease had come to an end and the fixtures were gone, although no authorization had ever been secured from the Bankruptcy Court for a sale out of the ordinary course of business, which is what would have been required to dispose of those fixtures in a manner consistent with the bankruptcy laws.

Similarly, no authorization was secured from the Bankruptcy Court to permit Parekh's father to take over the Premises of Kalpana Groceries to conduct his own unrelated business. By continuing to hold the lease in the name of the debtor while turning over the use of the Premises to his father and family, Parekh was able to insulate his father and his family from any liability to the Landlord for the use they were making of the Landlord's property.

The only legal entity reachable by the Landlord was the debtor, which was not only protected by the § 362 stay, so that any attempt to recover possession from it required the permission of the Bankruptcy Court, but which, unlike Parekh's father or possibly Parekh's family, had no income and no assets from which the Landlord could obtain satisfaction.

It is in this context that the present contempt proceeding must be viewed. While Parekh used the needs of his father and his family as a reason for not surrendering the Premises as ordered by the Court, neither his father nor his family ever took any responsibility for the payment of rent or offered to reimburse Look for the use they were making of his Premises.

Parekh is a very sophisticated businessman. Kalpana Groceries is only one of several businesses in which he is, or has been, involved. When he ceased to pay rent in November, 1984, and told Look, in effect, to "sue me," he did so with full knowledge that with the help of the bankruptcy laws he had created a situation where there was no one from whom the Landlord could recover the rent due, although the building was being used as a home by Parekh's family and as a place of active business by Parekh's father.

At the hearing on January 16th, 1985 (at which Parekh elected not to be present), the Court first learned that the automatic stay was not protecting Kalpana Groceries, the debtor, but was serving quite other purposes. Accordingly, the Court lifted the stay immediately.

Even after the Court lifted the stay and directed that the Premises be surrendered to the Landlord no later than January 31, 1985, Parekh and his family carried on as before, using the Look's building as their business and home, but making no payment therefore. The situation might have gone on indefinitely, but for the persistence of Mr. Look. Under threat of sanctions for contempt, Parekh, who had earlier simply ignored the order of the Court, now sought for the first time a

modification of that Order, an action clearly taken for its dilatory value, judging by its subsequent history.[7] This Court has no doubt that only the threat of sanctions for contempt induced the belated compliance with the Court's Order of January 16, 1985 and January 22, 1985.

As the Second Circuit noted last year: "It is well settled in this circuit that a party may be held in civil contempt for failure to comply with an order of the court if the order being enforced is 'clear and unambiguous, the proof of noncompliance is "clear and convincing" ' and the defendants have not 'been reasonably diligent and energetic in attempting to accomplish what was ordered.' *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.) (citations omitted), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). It is not necessary to show that defendants disobeyed the district court's orders willfully. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Donovan v. Sovereign Security Ltd.*, 726 F.2d 55, 59 (2d Cir.1984)." *EEOC v. Local 638 ... Local 28 of the Sheet Metal Worker's Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir.1985).

To this list of the elements of civil contempt must be added proof that the party charged with contempt had knowledge of the order he has disobeyed. When all these elements are present, civil contempt is established. *In re Parr*, 13 B.R. 1010, 1016 (E.D.N.Y.1981); *Danielson v. United Seafood Union*, 405 F.Supp. 396, 403 (S.D. N.Y.1975); *In re H & S Manufacturing, Inc.*, 13 B.R. 692, 696 (Bankr.S.D.N.Y. 1981); *In re Damon*, 40 B.R. 367, 374 (Bankr.S.D.N.Y.1984); *see also, Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir.1981).

In this case, Parekh's January 23, 1985 affidavit establishes that he knew on January 16, 1985 that the Court that day had directed Kalpana Groceries to surrender the portion of the Premises used for commercial purposes no later than January 23rd and the balance by the end of the month.[8] When the Court, on January 28, 1985, reaffirmed its earlier Order, Parekh was in court. Thus, knowledge of the Court's Order is established beyond peradventure.

Parekh and Kuriakose attempt to infuse ambiguity into the Court's clear directions by professing uncertainty as to the dividing line between the commercial portion of the Premises which were to be vacated by January 23, 1985, and the residential portion, which the debtor was allowed to retain until January 31st, 1985. This is a red herring. If there were any uncertainty, the fault lay at the door of Kuriakose on whose description of the Premises the Court relied in drawing the line of demarcation. Second, any ambiguity could have been clarified when the Landlord settled the January 22nd, 1985 Order on Kuriakose. Third, whatever else the commercial area covered, it clearly embraced the first floor where Parekh's father operated his store, yet the keys to that portion were no more surrendered on January 23rd, 1985 than those to the balance of the Premises.

Furthermore, what portion of the Premises were residential and what portion were commercial lost any legal significance on January 31st, 1985 when the debtor was ordered to surrender the keys to the entire Premises, whatever its use. And it is undisputed that nothing was surrendered un-

---

**7.** Parekh filed a Notice of Appeal on February 7, 1984, appealing the Order of this Court which denied a modification of the terms of the original Order, but did nothing further in pursuit of the matter. On December 10, 1985, the District Court entered an Order to Show Cause as to why the appeal should not be dismissed for failure to prosecute, and the appeal was dismissed on January 10, 1986.

**8.** Parekh's Affidavit dated January 23, 1985, states:

"My attorney has directed me, on January 16, 1985, to vacate the first floor by the 6 P.M. on January 23, 1985....

\* \* \* \* \* \*

My attorney has told me that I will have to vacate the 1st floor before the 23rd of January, 1985 and the 1st [sic] and 2nd floor by the end of the month."

til February 5, 1985 and the entire building was not vacated until February 10, 1985. That it was not the needs of the debtor that prevented compliance was established on January 28th, 1985, when Parekh conceded that no more than two days was needed to move the debtor's fixtures, fixtures which, as already noted, thereafter disappeared into thin air. But Kalpana Groceries had no authority to provide rent-free premises to Parekh's father and Parekh's family at the expense of the Landlord. Had Parekh or his father offered to pay the landlord the rental value of the Premises used and occupied by them, their needs would no doubt have been given sympathetic consideration by the Court. But what Parekh did, instead, was simply disregard the Orders compelling the debtor to surrender the keys, and thereby appropriate, for the benefit of himself and his father, the Landlord's valuable property.

■ Parekh, as President, sole shareholder and sole officer of Kalpana Groceries, may be held in civil contempt for the debtor's failure to comply with the Court's Orders. *Wilson v. U.S.*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *N.L.R.B. v. Hopwood Retinning Co.*, 104 F.2d 302, 305 (2d Cir.1939) (Corporate president held in civil contempt for his company's non-compliance with a court order where "the ultimate responsibility for this unfortunate ... situation is largely, if not solely, his".); *N.L.R.B. v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir.1984) (Officer of a corporation responsible for the corporation's actions and apprised of an order to the corporation, punished for civil contempt for the corporation's disobedience to the order); *Parker v. U.S.*, 126 F.2d 370, 379 (1st Cir. 1942); *U.S. v. Greyhound Corp.*, 363 F.Supp. 525, 571 (N.D.Ill.1973); *see also, N.L.R.B. v. Blackstone Mfg.*, 123 F.2d 633, 635 (2d Cir.1941). ("Equity has always treated as contumacious those who take an actual part in the defendant's own violation of its injunction, provided they have notice of the decree.").

It is well settled that:

"A command to the corporation is in effect a command to those who are officially responsible for the conduct of its officers. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt."

*Wilson v. U.S.*, 221 U.S. 361, 376, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911).

Parekh's control over the activities and resources of Kalpana Groceries was total. He knew of the Court Orders, he was the person directly responsible for the failure of the debtor to comply with them.

He is, therefore, subject to the sanctions appropriate to civil contempt.

■ Sanctions for civil contempt are imposed either to coerce compliance with the Order of the Court or to compensate the complainant for losses sustained for noncompliance. *McComb v. Jacksonville Paper*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Vuitton et Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979).

When this contempt proceeding was first brought, it had as its purpose to compel compliance. When it was brought on January 24th, the Landlord was faced with a flat refusal by Parekh to surrender the keys as ordered by the Court. It was continued after January 28th to seek compensation for the losses sustained as a result of the tardy compliance, which thereafter took place.

■ Compensatory damages for civil contempt may be awarded based on evidence of actual loss. *United States v. United Mine Workers of America*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *In re Johns-Manville*, 26 B.R. at 923; *Better Homes*, 52 B.R. at 431.

■ Attorneys' fees are also recoverable. *In re Damon*, 40 B.R. at 380; *Better Homes*, 52 B.R. at 431; *In re Depew*, 51 B.R. at 1014–15.

Apart from whatever statutory basis that may exist permitting the award of attorneys' fees, the Second Circuit has held that the complainant may be awarded attorneys' fees incurred as a result of prosecuting the contempt if the violation of the order is found to have been willful. *Vuitton*, 592 F.2d at 130; *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664–65 and n. 5 (2d Cir.1970); *Hudson Transit Lines v. Freund*, 509 F.Supp. 1172, 1175 (E.D.N.Y. 1981); *In re Arminio*, 38 B.R. 472, 481 (Bankr.D.Ct.1984). This Court finds that Parekh's disobedience was clearly willful. *See generally, Powell v. Ward*, 487 F.Supp. 917 (S.D.N.Y.1980) (defining "willful" as a "volitional act done by one who knows or who should reasonably be aware that his conduct is wrongful". *Id.* at 933, quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 531–32 (7th Cir.1974)); *see also, In re Jolly Joint, supra*, 23 B.R. at 395.

PROPOSED CONCLUSIONS OF LAW

1. Parekh caused the debtor not to comply with the January 16th and January 22nd Orders of the Court.

2. Although the debtor had the ability to comply with those Orders, Parekh deliberately disobeyed them for the purpose of protecting the possession of the Landlord's premises by his father and his family.

3. Parekh voluntarily chose not to turn over to Look the keys to the Premises with the knowledge that in not surrendering them, he was violating the Court's Orders. Parekh's disobedience was willful and did not end until February 10th, 1985.

4. Parekh, as the debtor's sole shareholder and sole officer, participated in the debtor's contempt and is answerable for such contempt. Both the debtor and Parekh are in contempt of this Court's Orders.

5. The Landlord is entitled to recover the damages caused by the contemptuous conduct of Parekh and of the debtor.

6. The Landlord suffered damages of $1,285.70 for the rent lost from February 1st to February 10th, 1985, inclusive.

7. The Landlord suffered damages in the amount of $138.50, representing the cost of travel and parking expenses in connection with the Landlord's unsuccessful attempts to collect the keys to the Premises from Parekh, which Parekh had been directed to surrender.

8. The Landlord is entitled to recover his attorney's fees for bringing this action for civil contempt, which fees amount to $1,200.00.

9. The Landlord is entitled to recover $838.00, representing travel and parking expenses and lost wages for the needless increase in the cost and burden of the litigation caused by Parekh or his attorney.