In re JOLLY JOINT, INC., Debtor.

KINGS PLAZA SHOPPING CENTER OF FLATBUSH AVENUE, INC., and Kings Plaza Shopping Center of Avenue U, Inc., Plaintiffs,

v.

JOLLY JOINT, INC. and Rex Regina Corporation, Defendants.

Bankruptcy No. 882-81141-18.
Adv. No. 882-0324-18.

United States Bankruptcy Court,
E. D. New York.

Sept. 28, 1982.

Norman Mendelson, Carle Place, N. Y., Kenneth Kirschenbaum, Garden City, N. Y., B. Mitchell Alter, Brooklyn, N. Y., for debtor.

Trubin, Sillcocks, Edelman & Knapp, New York City, for plaintiffs.

Marianne DeRosa, Glen Cove, N. Y., trustee.

## DECISION & ORDER

C. ALBERT PARENTE, Bankruptcy Judge.

This is a proceeding to hold Arthur Eisenman, principal of debtor Jolly Joint, Inc., Norman Mendelson, debtor's attorney in bankruptcy, and Kenneth Kirschenbaum, debtor's general counsel, in contempt of court for the alleged commission of the following misdeeds: (1) bad faith filing of a petition under Chapter 11 of the Bankruptcy Code; (2) filing false oaths; (3) perpetuating vexatious litigation; (4) disregarding the mandates of a prior order of this court; and (5) circumventing the exclusive jurisdiction of this court.

## FACTUAL BACKGROUND

On January 7, 1969, Kings Plaza Shopping Center entered into a written lease with Albert Planit wherein Kings Plaza leased to Planit a certain store area in its shopping mall for the period covering September 11, 1970, through January 31, 1991.

Thereafter, Planit operated a retail store known as "Home Decor" at the said location. On February 13, 1981, Kings Plaza served a notice of termination of the lease citing three substantial breaches of the tenants' obligations under the lease: (1) breach of the use clause; (2) presence of subtenants or concessionaires operating at the demised premises in violation of the lease; and (3) failure to maintain proper accounting and record procedures so that rentals due the landlord could be ascertained.

After trial before Judge Gloria C. Aronin of the Civil Court of the City of New York, a judgment was entered on July 23, 1981, awarding possession to the landlord. *Kings Plaza Shopping Center of Flatbush Avenue, Inc. v. Planit,* L & T Index No. 40978/81 (Kings County). Execution of the warrant was stayed until August 31, 1981.

Cognizant that the lease had been terminated by the Civil Court, Kenneth Kirschenbaum, Jolly Joint's general counsel, drafted and caused to be executed an agreement purporting to assign the lease from Planit to Jolly Joint.

In an effort to prevent Kings Plaza from recovering possession of the subject premises, the debtor embarked upon a course of vexatious litigation aimed at frustrating enforcement of the Civil Court judgment. The distressing history of the litigation is set forth at length by District Court Judge

Jacob Mishler in the appeal of a prior order of this court, *Kings Plaza Shopping Center of Flatbush Avenue, Inc. v. Jolly Joint, Inc.,* Civ. No. 82–1698, slip op. (E.D.N.Y. June 25, 1982), and need not be fully recounted herein.

On April 30, 1982, Jolly Joint, Inc. filed a petition under Chapter 11 of the Bankruptcy Code, thereby invoking the automatic stay provisions of 11 U.S.C. § 362. Kings Plaza commenced an adversary proceeding in this court to modify the existing stay to permit enforcement of the Civil Court judgment. The debtor then made a motion to dismiss the adversary proceeding. After trial, the court found that:

> ... Jolly Joint and its counsel have engaged in a vexatious scheme to thwart the mandate of the Civil Court of the City of New York.
>
> Jolly Joint's motion to dismiss the present adversary proceeding is one more example of the dilatory tactics employed by counsel to forestall Kings Plaza from exercising its fully litigated and fully appealed right to evict the unlawful occupants of its premises.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The court finds that Jolly Joint's motion for dismissal of the adversary proceeding is entirely without merit.
>
> Jolly Joint has proposed no reasonable basis to support a finding that the debtor can be rehabilitated. Indeed, the principal of Jolly Joint refused to take the stand to offer any assurance that Jolly Joint is a viable entity or that it has any rights whatsoever under the terminated lease.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Additionally, Jolly Joint's continued, unfounded court tactics, aimed primarily at frustrating Kings Plaza from enforcing its warrant of removal, constitutes cause for granting relief from the stay within the meaning of § 362(d)(1) of the Bankruptcy Code. [citations omitted]
>
> It further appears that Jolly Joint is seeking to invoke the protection that bankruptcy court affords without legal

basis and solely to frustrate and delay enforcement of the warrant of removal. *Kings Plaza Shopping Center of Flatbush Avenue, Inc. v. Jolly Joint, Inc.,* Adversary No. 882–0324–18 (June 10, 1982).

In light of the above findings, this court modified the stay to permit Kings Plaza to enforce the Civil Court judgment. Moreover, the court denied the debtor's application for a stay of the order pending appeal.

In a further effort to frustrate Kings Plaza's right of possession, Norman Mendelson, on behalf of the debtor, appealed the decision to the District Court. On appeal, Judge Mishler not only affirmed the holding of this court, but also assessed costs against Mr. Mendelson personally for taking a vexatious appeal:

> Norman Mendelson has succeeded in keeping the landlord out of rightful possession of the premises since April 30, 1982, by abusive manipulation of the protection afforded by the bankruptcy court, by filing a frivolous petition and by bringing this equally meritless and vexatious appeal. Counsel's vigorous performance of his professional obligation to his client (Mr. Mendelson's euphemistic characterization of this conduct), cannot be made at the expense of his professional obligations as an officer of the court. The court finds that Norman Mendelson has unreasonably and vexatiously multiplied the proceedings and increased the costs by taking this appeal and he is thereby personally assessed costs of $1,000 to be paid to Trubin, Sillcocks, Edelman & Knapp, attorneys for Kings Plaza. 28 U.S.C. § 1927.

*Kings Plaza Shopping Center of Flatbush Avenue, Inc. v. Jolly Joint, Inc.,* Civ. No. 82–1698, *supra* (citations omitted).

In footnote 6 of his opinion, Judge Mishler states that "[t]he costs assessed are solely for the unreasonable and vexatious appeal. We leave to Judge Parente any further assessment or other action he deems appropriate." *Id.*

While the appeal before Judge Mishler was still pending, the debtor retained yet another attorney, B. Mitchell Alter, for the

purpose of seeking a "reinstatement" to the subject premises in the state courts. The day before Judge Mishler's decision was handed down, Mr. Alter was successful in obtaining an *ex parte* order to show cause in the Civil Court of the City of New York, which granted a temporary restraining order (TRO) staying any proceedings by the landlord or city marshals in furtherance of enforcement, including re-rental of the premises.

Kings Plaza moved by order to show cause dated June 28, 1982, for a hearing before this court, seeking to: (1) "hold the debtor, its President, Arthur Eisenman, and its new counsel, B. Mitchell Alter, in contempt of court pursuant to 28 U.S.C. § 1481 for their attempt to circumvent the jurisdiction of this Court, for the continued pattern of vexatious proceedings and the misuse of this Court and its processes;" (2) assess costs personally against B. Mitchell Alter pursuant to 28 U.S.C. § 1927 for vexatiously multiplying the proceedings; and (3) appoint a trustee to supervise the estate pursuant to 11 U.S.C. § 1104.

The matter came on for hearing before this court on July 13, 1982. Because the testimony adduced at the hearing implicated the conduct of the debtor's other attorneys, Norman Mendelson and Kenneth Kirschenbaum, the court adjourned the hearing to permit Kings Plaza the opportunity to bring them into the proceeding.

By order to show cause dated July 20, 1982, Kings Plaza moved against Mr. Mendelson and Mr. Kirschenbaum seeking the same relief delineated hereinabove. A further hearing was held on July 28, 1982.

## I. THE BANKRUPTCY PETITION WAS FILED IN BAD FAITH AND UPON FALSE OATHS

### A. JOLLY JOINT WAS NOT A PROPER CHAPTER 11 DEBTOR

Jolly Joint filed a petition under Chapter 11 of the Bankruptcy Code on April 30, 1982, the same day that it was scheduled to be evicted by a New York City marshal pursuant to the aforesaid judgment of the Civil Court. Arthur Eisenman testified that Jolly Joint had no assets on the date of filing, save its purported interest under the terminated lease and $4,386.90 on deposit in an unspecified corporate bank account. (Hearing of July 13, 1982, at 72–73, 79–80). The corporation is nothing more than a shell which was denuded of its assets by its prior owner, Mark Benowitz. *See id.* at 120–21.

■ The overriding purpose of Chapter 11 of the Bankruptcy Code is business reorganization. *See* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 220–21 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Where, as here, a corporation possesses no assets capable of furthering the goals of reorganization and rehabilitation, it cannot avail itself of the relief afforded thereunder.

Respondents, Mendelson, Kirschenbaum and Eisenman, each knew at the time the petition was filed that the lease in question had been terminated by the Civil Court. *See* Transcript of July 13, 1982, at 46, 48. Moreover, they knew that the corporation had no other assets or operations capable of furthering a reorganization. (Testimony of Eisenman, July 13, 1982, at 23).

The testimony adduced at the respective hearings served to reinforce the court's prior finding that the filing of the petition was a bad faith attempt to frustrate Kings Plaza's right of enforcement of the Civil Court judgment. The court, therefore, held on July 28, 1982, that Jolly Joint did not qualify for Chapter 11 relief, and converted the case to Chapter 7. The court appointed an interim trustee on July 29, 1982.

### B. THE FILING OF FALSE OATHS

The petition, schedules and prior affidavits of Arthur Eisenman are so replete with material inconsistencies as to raise serious questions as to whether he and his counsel intentionally misled the court.

First, the petition identifies the debtor's business as "retail sales." In both the Statement of Financial Affairs and Exhibit A annexed to the schedules, on the other hand, it is alleged that the debtor is en-

gaged solely in the "real estate business" (by virtue of its purported interest in the lease in question).

Second, schedule B–2 states that the debtor has no inventory. However, in an affidavit dated November 25, 1981, which was drafted by Kenneth Kirschenbaum and submitted in a prior state court proceeding, Arthur Eisenman stated as follows:

> [T]he business of Jolly Joint and Rex Regina have flourished. Jolly Joint has invested hundreds of thousands of dollars in merchandise which is sold at the Kings Plaza Shopping Center location. There is presently located at the premises over $100,000 worth of merchandise.

In sharp contrast, the following representations were made by the debtor's counsel at the adversary proceeding trial before this court:

THE COURT: There are no priority creditors?

MR. MENDELSON: No, Judge.

THE COURT: No wage earners?

MR. MENDELSON: No, Judge.

THE COURT: They have no employees?

MR. MENDELSON: No, Judge.

THE COURT: Who operates this business; one man, Mr. Eisenman?

MR. MENDELSON: Yes, Judge.

THE COURT: No one else?

MR. MENDELSON: No one. else, Judge.

\* \* \* \* \* \*

THE COURT: What is the nature of this business? .

MR. MENDELSON: This business now and since 1981, has a lease with Kings Plaza, and as part of the lease, it has tenants.

THE COURT: You have no accountant? Mr. Eisenman is his own accountant?

MR. MENDELSON: He does have an accountant, but there are no books and records that are confiscated because all that's involved here are the monthly incomes from the tenants.

THE COURT: Is Jolly Joint engaged in the real estate business.

MR. MENDELSON: Yes.

THE COURT: Inventory not taken since August of 1981—the company has been in the real estate business?

MR. MENDELSON: Since 1981, yes, Judge.

THE COURT: Enlighten me as to what real estate business they have been in.

MR. MENDELSON: They have been in a business where they have had people who occupy space with them, again, open and notoriously, who pay rent to this corporation.

\* \* \* \* \* \*

THE COURT: No salaries paid, no inventory?

MR. EISENMAN: *It is the only thing the corporation owns, Your Honor, that lease. That Lease was bought, Your Honor.*

THE COURT: Is this an operating company?

MR. MENDELSON: I think it operates, Judge.

(Trial Transcript at 27–32; emphasis supplied).

In this context it should be noted that serious questions have been raised concerning the apparent fraudulent conveyance or concealment of the debtor's former assets. Mr. Eisenman testified at the hearing on July 13, 1982, that he was given the Jolly Joint store by Mark Benowitz, and was not asked to give any consideration in return. (Transcript at 37–38, 120–21). He further testified that Mr. Benowitz operated an unspecified number of Jolly Joint stores at other locations. *Id.* at 136–37. When Mr. Benowitz gave the store in question to Mr. Eisenman in September 1981, he allegedly took with him at least $21,000 in cash or merchandise. *Id.* at 120–21. Thus, Mr. Eisenman admitted that the debtor at one point had substantial assets which were no longer present at the time the petition in bankruptcy was filed.

The connection to Mr. Benowitz in this apparent subterfuge becomes more interesting when it is noted that he owns O. M. T., Inc., which was purported "subtenant" of Jolly Joint at the location in question.

Thus, theoretically, at least, Mr. Benowitz could have exercised dominion and control over whatever merchandise he allegedly "took" from Jolly Joint without removing it from the premises. Moreover, O. M. T. is the supplier for, and operator of, the other Jolly Joint stores. (Testimony of Eisenman, July 13, 1982, at 56, 119).

Further manifestations of the close relationship shared by the debtor and O. M. T. are that the debtor's attorneys' fees have been paid by O. M. T., *id.* at 94–95, and that O. M. T. offered to pay $130,000 on behalf of the debtor to settle the present proceedings out of court. (Testimony of Kirschenbaum, July 28, 1982, at 123).

Third, Mr. Eisenman testified that he collected rent from his purported "subtenants" in the approximate amount of $4,300 per month for eight months. He further testified that virtually all of this money was put in a certain corporate bank account, which he was unable to identify. (Transcript of July 13, 1982, at 72–74). Thus, there should have been approximately $35,000 in the account at the time the petition in bankruptcy was filed. Mr. Eisenman was at a loss to explain why the debtor's schedule B–2 showed deposits of only $4,386.90. *Id.*

Fourth, Mr. Eisenman testified that Jolly Joint never owned any fixtures or other tangible assets for as long as he has been president of the company. Yet, schedule B–2 indicates that the debtor owned $15,000 in "machinery, fixtures, equipment and supplies . . . ." (Transcript of July 13, 1982, at 74, 77.) Once again, Mr. Eisenman was unable to explain this apparent contradiction. *Id.*

Fifth, as mentioned above, Mr. Eisenman testified that Jolly Joint never owned any property while he was president. It is curious, therefore, that O. M. T., Inc., a company owned by Jolly Joint's prior owner, Mark Benowitz, is listed as an unsecured creditor in the amount of $10,000, representing the costs and expenses incurred by O. M. T. in installing fixtures and lights, and in painting the leased premises. (Schedule A–3). Moreover, the list of creditors annexed to the petition characterizes O. M. T.'s claim as being owed for "goods" rather than for "fixtures."

Finally, the petition lists the debtor's total assets as $50,000, whereas the schedules show total assets of $1,206,010.41. The rights under the lease are valued at $50,000 in the petition and are valued at $200,000 in the schedules.

In executing the debtor's petition and schedules, Arthur Eisenman certified the accuracy of the information contained therein under penalty of perjury. The number and magnitude of the inconsistencies make it clear that Mr. Eisenman intentionally provided the court with false and misleading information in order to have the court bestow the benefits of Chapter 11 upon Jolly Joint and perpetuate its existence thereunder. The statements appear to constitute false oaths in violation of 18 U.S.C. § 152. The trustee is therefore directed to refer the matter to the United States attorney for further investigation pursuant to 18 U.S.C. § 3057.

## II. THE CONTEMPT CHARGES

### A. FAILURE TO COMPLY WITH THE BANKRUPTCY CODE AND RULES

After the Chapter 11 petition was filed, the debtor, its principal, Arthur Eisenman, and its attorney, Norman Mendelson, violated numerous provisions of the Bankruptcy Code and Rules. At least two of the violations are relevant in this proceeding.

First, Mr. Eisenman, on two separate occasions, willfully and intentionally failed to appear for examination pursuant to 11 U.S.C. § 343. (Transcript of July 13, 1982, at 114–19).

Second, Mr. Mendelson, as debtor's bankruptcy attorney, had the obligation under 11 U.S.C. § 327 and Rule 18 of the Local Rules for the Eastern District of New York, to obtain the prior approval of the court for the retention of outside counsel for the post-petition state court proceeding. Mr. Mendelson, in full knowledge of what Mr. Alter intended to do, turned over the debtor's file and conferred with Mr. Alter re-

garding the proposed state court proceeding, see Transcript of July 13, 1982, at 151, without seeking the requisite prior order of retention.

## B. THE SUBSEQUENT STATE COURT PROCEEDING

The commencement of the state court proceeding after this court had rendered its decision on June 10, 1982, constituted at least three serious violations of law and professional practice: (1) It was a willful attempt to evade this court's exclusive jurisdiction; (2) It was in direct disregard of this court's order of June 10, 1982; and (3) It continued the debtor's history of vexatious litigation.

### (1) *Evasion of Exclusive Jurisdiction and Disregard of the Court's Prior Order*

Once the debtor filed its petition for relief under Chapter 11, this court was vested with exclusive jurisdiction of all cases involving the property of the debtor. 28 U.S.C. § 1471(e). This grant of exclusive jurisdiction prevents both debtors and creditors alike from turning to other judicial fora for relief. No forum shopping can be countenanced where the well-being of the debtor and the equitable administration of the estate are at stake.

As mentioned above, this court rendered a decision on June 10, 1982, which constituted an order of the court, condemning the debtor's unwarranted attempts to frustrate the Civil Court judgment. The court's order, in no uncertain terms, denounced the debtor's unceasing attempts to engage in frivolous and vexatious litigation. After delineating the debtor's prior efforts to prevent enforcement of the Civil Court judgment, the court specifically found the debtor to have engaged in "continued, unfounded court tactics, aimed primarily at frustrating Kings Plaza from enforcing its warrant of removal." *Kings Plaza Shopping Center of Flatbush Avenue, Inc. v. Jolly Joint, Inc.,* Adversary No. 882–0324–18, *supra,* at 5. The court, therefore, modified the automatic stay of 11 U.S.C. § 362 to permit Kings Plaza to enforce its judgment.

In full knowledge of the court's prior holdings, and without leave of the court, the debtor, its principal, and its attorneys commenced a proceeding in state court to prevent the very thing that this court had held it did not have the right to prevent, *i.e.,* enforcement of the Civil Court judgment. Moreover, they proceeded *ex parte,* without reciting in the moving papers that the appeal before Judge Mishler was still pending. Even *after* Judge Mishler's decision was handed down on June 25, 1982, they made no attempt to discontinue the proceeding.

The decision to proceed in state court appears to have been the joint product of the debtor's three attorneys, Norman Mendelson, Kenneth Kirschenbaum and B. Mitchell Alter. When the decision of this court was handed down on June 10, 1982, Mr. Kirschenbaum cavalierly decided that he disagreed with the court's findings therein, (Testimony of Kirschenbaum, July 28, 1982, at 110–11), and in blatant disregard of the dictate of the order, arranged for the debtor to retain B. Mitchell Alter as counsel for further state court proceedings. *Id.* at 102.

Mr. Alter testified at the hearings that the ultimate decision to proceed in state court was made by "Mr. Eisenman in consultation with Mr. Mendelson," (Transcript of July 13, 1982, at 152), and that he was told by Mr. Mendelson and Mr. Kirschenbaum to "go ahead" with the proceeding. (Transcript of July 28, 1982, at 42). He further testified that he felt Jolly Joint had a viable case to present to the state court under landlord-tenant law.

Mr. Alter, a landlord-tenant attorney, had never practiced in any bankruptcy matters prior to this case and relied upon the bankruptcy expertise of Mr. Mendelson. *Id.* at 38, 46–49. At no time during their discussions concerning possible state court proceedings did Mr. Mendelson or Mr. Kirschenbaum advise Mr. Alter of the exclusive jurisdiction of the bankruptcy court. *Id.*

Mr. Alter's reliance upon the advice of bankruptcy counsel may not have been unreasonable under the circumstances here present. The court therefore dismissed the charges brought against him at the time of the July 28, 1982, hearing.

■ Similarly, Mr. Eisenman was acting upon the advice of counsel. The court therefore finds that he did not have a sufficient degree of *scienter* to hold him in contempt for initiating the state court proceeding.

■ Mr. Mendelson has been practicing before this court since 1978. Mr. Kirschenbaum has been a trustee in bankruptcy since 1975, and has been involved in hundreds of cases before this court. It is, therefore, inconceivable that either of these attorneys were unaware of the exclusive jurisdiction granted to this court under 28 U.S.C. § 1471. In any event, as bankruptcy practitioners, they are charged with full knowledge of bankruptcy law and procedure, including the court's pervasive jurisdiction over the affairs of Chapter 11 debtors.

■ It was incumbent upon Mr. Mendelson, as the debtor's attorney of record, to advise the debtor that it was prohibited from proceeding in state court. He not only failed to do so, but he affirmatively aided and abetted the debtor's other counsel in bringing the state court action. (Testimony of Alter, July 13, 1982, at 152; Testimony of Mendelson, July 28, 1982, at 82–83).

Kenneth Kirschenbaum is not the debtor's attorney of record in bankruptcy. However, he has been the debtor's general counsel throughout its struggle with Kings Plaza to remain in possession. The court finds from the testimony adduced at the hearings that he has been intimately involved, as friend and counsel to the debtor, its affiliates, and its principal, with each successive stage of the vexatious litigation described hereinabove. *See e.g.,* Transcript of July 28, 1982, at 44. Moreover, Mr. Kirschenbaum apparently provided Mr. Mendelson with a great deal of the errone-

ous information upon which the debtor's petition in bankruptcy was based. (Transcript of July 13, 1982, at 24–25, 46–48). Mr. Kirschenbaum also made the initial decision to refer the debtor to B. Mitchell Alter for the purpose of frustrating the Civil Court judgment. (Testimony of Kirschenbaum, July 28, 1982, at 101–02). Mr. Alter testified that Mr. Kirschenbaum told him to "go ahead" with the state court proceeding. (Transcript of July 28, 1982, at 41–42). Indeed, the moving papers for the *ex parte* order to show cause were signed at Mr. Kirschenbaum's house. *Id.* at 106–07.

■ Mr. Kirschenbaum contends that this court is without the requisite authority to hold the debtor's attorneys in contempt. It cannot be denied that the court possesses the inherent power to enforce compliance with its lawful orders through *civil* contempt sanctions. *See Shillitani v. U. S.,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). The court's power to punish for *civil* contempt is derived from the authority it possesses under 11 U.S.C. § 105(a) to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." The court's power to punish for *criminal* contempt, on the other hand, is more limited. Pursuant to 28 U.S.C. § 1481, the court is precluded from punishing a criminal contempt not committed in its presence. It must be determined, therefore, whether punishment for the contempt found by this court would be in the nature of a civil or a criminal sanction.

The Court of Appeals for the Second Circuit has held that:

> The hallmark of civil contempt is that the sanction imposed is only contingent and coercive. Civil contempt, moreover, has a remedial purpose—compelling obedience to an order of the court for the purpose of enforcing the other party's rights, or obtaining other relief for the opposing party. The distinction between civil and criminal contempt is, in short, "usually based on the purpose for which the contempt sentence is meted out."

*International Business Machines Corporation v. U. S.,* 493 F.2d 112, 115 (1973), *cert.*

*denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (citations omitted).

The Second Circuit further refined the distinction in *In re Irving:*

> The chief characteristic of civil contempt is that its purpose is to compel obedience to an order of the court to enforce the rights of the other party to the action. Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance. This is often accomplished by a purgation provision, whereby a civil contemnor may purge himself of contempt at any time by compliance. The purpose of an order of criminal contempt, on the other hand, is punitive. It is imposed to vindicate the court's authority. Accordingly, compliance with the court's command will not lift the sanction. In responding to a single contemptuous act, a court may well impose both criminal and civil sanctions—wishing to vindicate its authority and to compel compliance.

600 F.2d 1027, 1031, *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979) (citations omitted).

■ Based on the foregoing decisions, the court finds that any contempt found under the facts herein would be primarily of the criminal, rather than of the civil, variety. Any sanctions imposed would be punitive, not remedial. No evidence was submitted to the court tending to show that Kings Plaza lost significant rent monies as a result of the contumacious conduct of the debtor and its attorneys. Kings Plaza's rights in regard to rent payments from Jolly Joint for the period of occupancy remain unaffected by the bad faith bankruptcy petition and the subsequent proceedings. Moreover, Kings Plaza has regained possession of the premises.

■ The court finds from the testimony at the respective hearings that there is probable cause to believe that respondents Mendelson and Kirschenbaum willfully violated the prior order of this court and willfully circumvented the exclusive jurisdiction of this court.

■ In a criminal contempt proceeding, the defendants must be accorded the fundamental protections of criminal procedure. *U. S. v. Schlicksup Drug Co.,* 206 F.Supp. 801 (D.Ill.1962). The hearings before this court have been of the civil variety, and are not alone sufficient to support a conviction of criminal contempt. In order to give the defendants the full measure of procedural safeguards that are due them, the court hereby directs the trustee to take all steps necessary to initiate appropriate criminal contempt proceedings in the District Court.

### (2) *Continued Vexatious Litigation*

Throughout the long history of this case, the debtor, its principal, and its counsel have engaged in needless and vexatious litigation. Judge Mishler has already assessed costs of $1,000 against Norman Mendelson for taking a vexatious appeal of this court's order of June 10, 1982. By the terms of his decision, Judge Mishler expressly left for this court the determination of whether further costs should be assessed for the frivolous bankruptcy case that was commenced by the debtor. *Kings Plaza Shopping Center of Flatbush Avenue, Inc. v. Jolly Joint, Inc.,* Civ. No. 82–1698, *supra.*

■ The court finds, *inter alia,* that pursuant to 28 U.S.C. § 1927, Norman Mendelson and Kenneth Kirschenbaum unreasonably and vexatiously multiplied the proceedings in this court. Accordingly, they are each personally assessed costs of $2,000, payable to Trubin, Sillcocks, Edelman & Knapp, for the unnecessary litigation they initiated and perpetuated.