In re McLEAN INDUSTRIES, INC., First Colony Farms, Inc., United States Lines, Inc. and United States Lines (S.A.), Inc., Debtors.

**UNITED STATES LINES, INC., Plaintiff,**

**v.**

**GAC MARINE FUELS LTD., Defendant.**

**Bankruptcy Nos. 86 B 12238 through 86 B 12241 (HCB).**

United States Bankruptcy Court, S.D. New York.

Dec. 29, 1986.

Milbank, Tweed, Hadley & McCloy, New York City, for debtors; by Richard D. Cleary.

Philip V. Moyles, New York City, for defendant.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

United States Lines, Inc., a debtor herein (the "debtor") seeks from this Court a preliminary injunction restraining defendant GAC Marine Fuels Ltd. ("GAC Marine") from taking any action to arrest or interfere with vessels and other property of this estate. It further seeks an order holding GAC Marine in civil contempt for violating both the automatic stay applicable to this proceeding by the filing of the petition, 11 U.S.C. § 362, and the restraining order issued by this Court.[1] GAC Marine, although essentially admitting the underlying facts, opposes these motions, declaring that it, as a non-domiciliary corporation organized under the laws of the United Kingdom and with a principal place of business in London, is not subject to the *in personam* jurisdiction of this Court. The Debtor disputes this assertion and thus, the principal issue to be resolved by this Court is whether GAC Marine is subject to *in personam* jurisdiction before this Court. An evidentiary hearing was held on December 22, 1986.

### I

The debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (1984) (the "Code") on November 24, 1986. On that date, this Court issued an order, which restated the automatic stay provided by § 362(a) of the Code and not excepted by § 362(b) of the Code. The Debtor has remained in possession and continues to operate its trans-Pacific and western hemisphere cargo shipping services. It is in the process of terminating its around the world and North Atlantic services.

---

1. The debtor further seeks a finding that it has been damaged with the amount thereof to be resolved at trial. Except to the extent that the concept of damages is implicit within a claim of

having suffered irreparable injury, consideration of this issue was declined at the hearing on the motion and reserved for trial.

The facts are not in dispute. On December 4, 1986, ten days after the petition was filed, GAC Marine commenced an *in rem* admiralty action in the Supreme Court of Hong Kong against the debtor, pursuant to a Writ of Summons (Debtor's Exhibit 4), for the payment of $173,750 allegedly owed it for fuel oil delivered on board the AMERICAN UTAH, a vessel owned by the debtor, in October 1986 in Khorfakkan Port, United Arab Emirates. On December 9, 1986, upon application of GAC Marine, the Hong Kong court issued a warrant of arrest against the AMERICAN CALIFORNIA, also owned by the debtor. As a result, this vessel has since been restrained from leaving Hong Kong harbor.

On December 8, 1986, GAC Marine commenced an admiralty proceeding in the High Court of the Republic of Singapore against the debtor as the owner of the AMERICAN OKLAHOMA. This proceeding was commenced to recover $69,500 allegedly owed by the debtor to GAC Marine for fuel oil delivered on the vessel AMERICAN WASHINGTON on November 5, 1986, also in Khorfakkan Port. The Singapore court issued, on December 8, 1986, a warrant of arrest directed at the AMERICAN OKLAHOMA (Debtor's Exhibit 5), also owned by the debtor.

GAC Marine took these actions with knowledge of the debtor's filing of its reorganization petition and the resultant automatic stay provided by § 362 of the Code, and, after being informed by the debtor that such actions would be improper (Tr. at 34),[2] carried out a threat contained in a telex from GAC Marine to the debtor dated November 28, 1986. That telex stated:

> As outlined below, our invoices nos. AG86/10/010 and AG86/10/011 fell due for payment on the 27th November 1986. On request by agents for payment of these invoices, we have been informed of your refusal to settle all outstandings as your company has filed for bankruptcy under Chapter 11 of the U.S. Law.

> Accordingly, all invoices as set out hereunder and and [sic] applicable to the following ships must be settled immediately.

| Ship | Inv. No. | Amount |
|---|---|---|
| GULF PIONEER | AG86/10/011 | USD 48,190 |
| AMERICAN UTAH | AG86/10/010 | USD 173,750 |
| AMERICAN WASHINGTON | AG86/10/013 | USD 69,500 |

> Chapter 11 procedure in the USA is not enforceable in foreign jurisdictions. Therefore we are entitled to arrest any U.S. Lines ship abroad and unless prompt settlement is made to us, we will have no recourse other than to take such action as is deemed necessary by our lawyers for the protection of our interests. We will therefore arrest your ships one-by-one unless settlement is made immediately.

(Exhibit 3(D)).

The debtor commenced this adversary proceeding on December 16, 1986. In its complaint, it recites the issuance of the Hong Kong warrant and the Singapore arrest, asserts that they are attempts to recover pre-petition debts and constitute seizures of its property in violation of the automatic stay and this Court's order of November 24, 1986, and claims damages and irreparable injury through being unable to utilize the two vessels in the course of its reorganization. Judgment is sought adjudging the defendant in violation of the automatic stay and the November 24 order, decreeing the defendant to be in civil contempt, certifying the Court's findings of fact to the district court pursuant to Bankruptcy Rule 9020 for criminal contempt proceedings, enjoining further violations by the defendant and requiring the defendant to take appropriate steps to dissolve any writs, warrants or other process that have been issued against any U.S. Lines vessels at the defendant's request, and awarding the plaintiff compensatory and punitive damages.

On notice to the defendant and after hearing its counsel on December 16, 1986,

---

**2.** References ("Tr.") are to the transcript of the Schmidt deposition and exhibits ("Exhibits") introduced at trial, all of which were admitted into evidence at the hearing. References to "R." are to pages of the transcript at the hearing.

this Court issued a temporary restraining order against GAC Marine preventing interference with property of this estate in an effort to collect on prepetition debts.

GAC Marine is, we are told by its counsel, a subsidiary of a Liechtenstein corporation (R. at 27) (Exhibit 2(2)), apparently known as Gulf Agency Company ("GAC") which has its central office in Athens, Greece (Exhibit 2(1)). GAC Marine's principal offices are located in London, England but its invoices state that it also has offices in Hong Kong, Norway, United Arab Emirates and Basking Ridge, New Jersey (Exhibit 2(2)). The New Jersey office is apparently located in the same office as that of G.A.C. Shipping (North America) Ltd. ("GAC Shipping"), another GAC subsidiary. That office is staffed by one Norman Schmidt, Georgianne Temple and Marilyn Taylor, who are paid by GAC Shipping with funds supplied by GAC (Tr. at 55). But Schmidt styles himself as manager of GAC's U.S. office (Tr. at 4) and his business card is under the name of the defendant GAC Marine (Exhibit 3(D)). GAC and GAC Marine, according to Schmidt, "apparently are run by the same people." (Tr. at 11–12).

Schmidt describes his duties for GAC Marine as "sales and contact and follow through." (Tr. at 52). As this description implies, he and his fellow workers do more than merely solicit business from potential American customers seeking to purchase marine fuel (bunkers) for delivery overseas. With respect to the seven to fifteen transactions per month he and his staff work on for GAC Marine (Tr. at 16), once the potential customer's needs are identified, the New Jersey office telexes them to the London office, with a copy to the local Sharjah office in the United Arab Emirates, since marine fuels are often purchased in the lower Persian Gulf. Schmidt or one of the other employees at the New Jersey office would then receive price quotes and availability of fuel statements from both those offices for the date the vessel would require its supply. That information would then be relayed by the New Jersey office to the prospective purchaser. If the prospec-

tive purchaser accepted the terms, the New Jersey office would telex back to the London and Sharjah offices. At this point, the agreement would usually be completed, confirmation from the foreign offices not normally being expected or required (Tr. at 14–15). After delivery of bunkers overseas, Temple or Taylor would transmit GAC Marine invoices and delivery receipts to the purchaser or its agents (Tr. at 23; Exhibits 2(3), 2(4)). The two instances of such transmission in evidence here were by cover letter on the letterhead of GAC Marine. The letterhead states the address and telephone and telex numbers for GAC Marine in the locations noted above, including the Basking Ridge, New Jersey office.

These general practices and procedures were followed with respect to the 30 transactions between GAC Marine and the debtor through its agent Secor Energy Inc. in the past year (Tr. at 28, 43–44; Exhibits 2(3)–2(7)). Although the debtor generally made payment in London, its last three payments were made to the New Jersey office which transmitted the funds to London. In addition, the New Jersey office played an active role in the month prior to the filing of the petition by initiating possible protections for GAC Marine's interest and reducing GAC Marine's exposure. With respect to the sale of bunkers to the debtor to be supplied to the AMERICAN WASHINGTON, it suggested that the debtor obtain a bank guarantee and that an outstanding invoice be accelerated (Exhibit 2(5)). It told the London office that "we will have to make a decision" in light of rumors of a possible bankruptcy filing, and repeated that it had thought out the best way "to improve our position." (*Id.*). It thereupon received a check for $139,000 on another invoice before agreeing to supply the AMERICAN WASHINGTON with $69,500 of bunkers, and another check for $330,000 before agreeing to supply the AMERICAN UTAH with $173,000 of bunkers (*Id.*).

## II

In this case we need not pause to consider the oft-noted standard for the issuance

of a preliminary injunction in this Circuit, *i.e.*, irreparable injury and either probability of success on the merits or the raising of sufficiently complex issues requiring further litigation with the balance of equities tipping in favor of the movant. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979). It is undisputed here that in causing the issuance of the Hong Kong and Singapore warrants, the defendant took steps to proceed on a pre-petition claim in violation of 11 U.S.C. § 362(a)(1) and disturbed the debtor's possession of its property in violation of 11 U.S.C. § 362(a)(3). Success on the merits, not just a mere probability, has thus been shown here. It matters not that the property of the estate was located beyond the territorial borders of the United States. Section 541(a) makes clear that property of the estate is not so confined but consists of all property "wherever located" in which the debtor has an interest. Accordingly, the defendant makes no claim that the two vessels are not property of the estate. So too has irreparable injury been established. Aside from the notion that the debtor is being deprived of the use of its vessels in the conduct of its business, Congress, by enacting § 362(a), has deemed the injury resulting from the acts there proscribed to be irreparable. *E.g., Beker Industries Corp. v. Florida Land and Water Adjudicatory Commission (In re Beker Industries Corp.)*, 57 B.R. 611, 623, 14 B.C.D. 136 (Bankr.S.D.N.Y.1986). Rather, the question here concerns whether the defendant is subject to *in personam* jurisdiction so that the remedies sought for the violation may be imposed.

### III

Before turning to that issue, however, we pause to consider this Court's subject matter jurisdiction and particularly its power to issue a civil contempt decree. Although the parties have not raised the issue, and the defendant makes no challenge to the power of this Court in that respect, courts are obliged to consider their own jurisdiction before proceeding.

Like all proceedings "arising under title 11 or arising in or related to a case under title 11," 28 U.S.C. § 157(a), this adversary proceeding was referred to us pursuant to the general order of reference entered by the United States District Court for the Southern District of New York on July 10, 1984. *See Lesser v. A–Z Associates (In re Lion Capital Group)*, 46 B.R. 850, 852–61, 12 B.C.D. 840, 12 C.B.C.2d 59 (Bankr.S.D.N.Y.1985) (discussion of the Congressional scheme established in 28 U.S.C. § 157). At least to the extent injunctive relief and an order of contempt are sought, it is also a core proceeding as opposed to a related proceeding under 28 U.S.C. § 157(c)(1). *Manville Corp. v. Equity Security Holder's Committee (In re Johns-Manville Corp., et al.)*, 801 F.2d 60, 64 (2d Cir.1986); *In re Elegant Concepts, Ltd.*, 67 B.R. 914, 917 (Bankr.E.D.N.Y. 1986); *Lion Capital*, 46 B.R. at 854–55. Although an action seeking civil contempt is not expressly denominated as such in 28 U.S.C. § 157(b), it directly concerns the administration of the estate as set forth in § 157(b)(1). It is beyond cavil in this Circuit that an action seeking injunctive relief to stop a threatened impact to estate administration is a core proceeding. *Johns-Manville*, 801 F.2d at 64; *Lion Capital*, 46 B.R. at 854–55. *A fortiori*, a proceeding seeking contempt for violation of a court ordered or statutory injunction is a core proceeding. Indeed, bankruptcy courts had such power within their limited summary jurisdiction under the former Bankruptcy Act. *Fidelity Mortgage Investors v. Camelia Builders, Inc. (In re Fidelity Mortgage Investors)*, 550 F.2d 47, 50–55 (2d Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) (decided under Rule 11–44 of the former Rules of Bankruptcy Procedure and § 311 of the Bankruptcy Act of 1898, 11 U.S.C. § 711 (repealed)).

Further, a proceeding involving a post-petition arrest of estate property clearly is one "affecting the liquidation of the assets

of the estate" as provided in § 157(b)(2)(O). In causing process to issue with respect to a debtor's property in violation of § 362(a) or a court order, a creditor is affecting the very ability of the bankruptcy court to govern such a liquidation and to fairly distribute same and is tampering with the exclusive jurisdiction over all such property afforded by 28 U.S.C. § 1334(d). The defendant itself concedes that it is attempting to leverage its pre-petition claims in the event of liquidation and thereby come ahead of other similarly situated creditors (R. at 41).

In addition, this Court has subject matter jurisdiction to entertain the matter not only in the debtor's request for injunctive relief and damages but also in its request for a finding of contempt. *Better Homes of Virginia, Inc. v. Budget Service Company (In re Better Homes of Virginia, Inc.)*, 52 B.R. 426, 428–30, 13 B.C.D. 454, 13 C.B.C.2d 377 (E.D.Va.1985), *aff'd*, 804 F.2d 289 (4th Cir. 1986); *In re Crum*, 55 B.R. 455, 457–59 (Bankr.M.D.Fla.1985); *In re L.H. & A. Realty*, 62 B.R. 910, 918, 15 C.B.C.2d 144 (Bankr.D.Vt.1986); *In re Elegant Concepts, Ltd.*, at 918. It is plain that the power of the bankruptcy court to issue an order of civil contempt is derived from three sources: the inherent power of a court, including an Article I court, the reference of the inherent power of the district court, and the statutory grant contained in 11 U.S.C. § 105.

■ The evident purpose of a civil contempt order necessarily implies that the bankruptcy court has the inherent power to issue one. A civil contempt order is remedial and coercive in nature, and is intended to secure compliance with lawful judicial decrees. *In re Irving*, 600 F.2d 1027, 1037 (2d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979); *International Business Machines Corp. v. United States*, 493 F.2d 112, 115 (2d Cir.1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). It is, therefore, fashioned in a way that is contingent on compliance with the order. This is often accomplished by a purgation provision, whereby a civil contemnor may purge himself of contempt at any time by compliance. *See generally* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2960 (1973 & Supp.1984).

■ All courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders. The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *United States v. Hudson and Goodwin*, 11 U.S. (7 Cranch) 31, 32, 3 L.Ed. 259 (1812); *Francis v. People of Virgin Islands*, 11 F.2d 860, 864 (3d Cir. 1926); *Fleming v. United States*, 279 Fed. 613, 616 (9th Cir.), *cert. dismissed*, 260 U.S. 752, 43 S.Ct. 10, 67 L.Ed. 496 (1922); *United States v. Talbot*, 133 F.Supp. 120, 126 (D.Alaska 1955); *In re Jolly Joint, Inc.*, 23 B.R. 395, 402, 9 B.C.D. 841 (Bankr.E.D.N. Y.1982); 2 L. King, *Collier on Bankruptcy*, ¶ 105.03, at 105–07 (15th ed. 1985). No specific statute is required to invest a court with contempt power; specific legislation, rather, restricts this power. *Michaelson v. United States*, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed.2d 162 (1924).

In addition, the bankruptcy courts on reference are able to enter final orders in core proceedings. 28 U.S.C. § 157(b); *In re Lion Capital Group*, 46 B.R. at 860. "Civil contempt proceedings are considered to be a part of the action from which they stem." 4 C. Wright & A. Miller, *Federal Practice & Procedure* § 1017, at 89 (1969 & Supp.1984).

The bankruptcy courts also have the task of applying the provisions of the Bankruptcy Code in the rehabilitation of financially distressed debtors and in the recovery and liquidation of debtors' assets for the benefit of their creditors, often under the press of time because of threat of financial loss. It would be incongruous if this Court would have to look to the district court to enforce its many orders issued in performing its duty. *See In re Crabtree*, 39 B.R. 702, 708 (E.D.Tenn.1984) (citing legislative history of Bankruptcy Reform Act of 1978),

*aff'd*, No. 3–83–01116, slip op. at 5 (E.D. Tenn. March 5, 1984), *aff'd sub nom. Liberis v. Craig*, 767 F.2d 920 (6th Cir.1985). Such bi-level court involvement would unquestionably produce a substantially less effective and less efficient bankruptcy system. It would, moreover, unduly burden the already complex and congested calendars of the district courts, and undermine the reasons for the district court's reference of Code cases to the bankruptcy courts.

That the bankruptcy courts are Article I courts, *see Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 61, 102 S.Ct. 2858, 2866, 73 L.Ed.2d 598 (1982), does not change this conclusion. Article I bodies have traditionally been vested with contempt power. *See Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, ——, 105 S.Ct. 3325, 3334, 87 L.Ed.2d 409, 412 (1985) ("[t]he Court has long recognized that Congress is not barred from acting pursuant to its powers under Article I to vest decision making authority in tribunals that lack the attributes of Article III courts"). This is illustrated by the Tax Reform Act of 1969 which, in creating the Article I United States Tax Court, both codified and restricted the 'court's contempt power. 26 U.S.C. §§ 7441, 7456(e). It was observed that "it seems inappropriate that the Tax Court is required to look to the District Courts to enforce its own authority." S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad. News 2027, 2341.

The principle is seen again in the operation of the United States Claims Court. Its contempt power is not codified, but stated and defined in Rule 37(b) of the Claims Court Rules.

Similarly, the Court of Military Appeals, which has Article I status, *see* 10 U.S.C. § 867, has contempt power which has not been codified but instead is set forth by its Rules. Rule 41(b) indicates that the court's contempt power is subject to Section 401 of Title 18, the basic statute governing the criminal contempt power of every "court of the United States."

In *United States v. Talbot*, the Alaska territorial court confirmed its contempt power, rejecting the argument that non-Article III courts lack this power. The court ruled that, even if section 401 of Title 18 was not applicable to it as a legislative court, it would have inherent power to punish any contempt which "obstructs the administration of justice." 133 F.Supp. at 126.

The same conclusion was reached by the Ninth Circuit in *Fleming v. United States*, 279 Fed. at 616, which held that the United States Court for China, a legislative court, had contempt power which was "inherent in the nature and constitution of such a court." 279 Fed. at 616. Similarly, the Third Circuit, in *Francis v. People of Virgin Islands*, 11 F.2d at 864, ruled that the District Court of the Virgin Islands has contempt power on the ground that "inherent in every court within our government, colonial and national, there is power to enforce and protect the administration of justice within its jurisdiction."

Other Article I bodies have been unquestionably vested with contempt power. Congress has exercised its contempt power, *e.g., Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 226–232, 5 L.Ed. 242 (1821), and has empowered administrative agencies to exercise the comparable power to impose civil penalties. *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 451, 97 S.Ct. 1261, 1267, 51 L.Ed.2d 464 (1977).

The Supreme Court's decision in *Marathon* does nothing to change the conclusion that an Article I court has civil contempt power, for that power attaches only to orders issued as to those legal disputes which Congress, by enacting the Code, has empowered the bankruptcy courts to hear and resolve as adjuncts to the district court. *Cf. Commodity Futures Trading Commission v. Schor*, —— U.S. ——, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

Since the bankruptcy courts of this district are vested with civil contempt power

as to the core proceedings which the district court has referred to them pursuant to 28 U.S.C. § 157(c), it is only necessary to determine whether the power is restricted. We conclude, as did the courts noted above, that it is not. Indeed, it is expressly authorized by statute.

Under § 105 of the Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [11 U.S.C. §§ 101 *et seq.*]." This section is generally read to cover the issuance of contempt citations. *See Collier on Bankruptcy,* ¶ 105.03, at 105–07; *1986 Collier Pamphlet Edition, Bankruptcy Code,* Comment on § 105, at 36.

Rule 9020 of the Rules of Bankruptcy Procedure supports the conclusion that Congress intended the bankruptcy courts to exercise criminal contempt power.[3] It limits a bankruptcy judge's exercise of *criminal* contempt authority to acts committed in his actual presence. That a bankruptcy judge's *civil* contempt power is not restricted is evidenced by the Advisory Committee Note to Rule 9020:

> The Federal Rules of Civil Procedure do not specifically provide the procedure for the imposition of civil contempt sanctions. The decisional law governing the procedure for civil contempt sanctions by the district court will be equally applicable to the bankruptcy courts.

This rule, promulgated by the Supreme Court after its decision in *Marathon,* confirms the jurisdiction of this Court to issue an order of contempt in a core proceeding.

---

**3.** Former Bankruptcy Rule 920, discussed in *Fidelity Mortgage,* 550 F.2d at 50, limited to $250 the fine that could be imposed by a bankruptcy court upon finding civil contempt. That limitation was removed with the adoption of Bankruptcy Rule 9020.

**4.** No claim is made on this motion that *in personam* jurisdiction may be posited on the notion that the interest of the United States in administering bankruptcy proceedings of domestic corporations is so strong as to justify the right of its courts, in the exercise of exclusive jurisdiction over the property of the estate afforded by 28 U.S.C. § 1334(d), to enjoin attempts to divest

## IV

With subject matter jurisdiction to proceed on both the injunctive and contempt grounds, we return to consideration of whether the defendant is subject to *in personam* jurisdiction here on these causes of action and generally.

The limits of such *in personam* jurisdiction are apparently conceded by both sides to be tested by due process. This is not a case in diversity where state law concepts govern the extent of personal jurisdiction. *E.g., CutCo Industries, Inc. v. Naughton,* 806 F.2d 361 (2d Cir.1986); *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir.1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1189, 20 L.Ed.2d 95 (1968). Rather, this is a case involving the violation of a federal statute and related court order. There is nothing that indicates that Congress sought to assert *in personam* jurisdiction on any standard other than due process in an action concerning a breach of the automatic stay through arresting, seizing or attaching estate property. *Cf. Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972); *In re Fotochrome Inc.,* 377 F.Supp. 26, 29 (E.D.N.Y.1974), *aff'd,* 517 F.2d 512 (2d Cir. 1975).

Two grounds for the exercise of such jurisdiction consistent with due process are asserted here: (i) transactional jurisdiction as set forth in 1 *Restatement (Second) of Conflicts of Laws* § 47(1) (1971) (the "*Restatement*") and (ii) general "doing business" jurisdiction as set forth in § 47(2) of the *Restatement.*[4] *See Leasco,* 468 F.2d at 1340.

---

them of that jurisdiction and to determine the rights of all creditors wherever they may be. *Cf. Mullane v. Central Hanover Bank Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed.2d 865 (1950); *Hartford Life Ins. Co. v. IBS,* 237 U.S. 662, 35 S.Ct. 692, 59 L.Ed. 1165 (1915); *Bernheimer v. Converse,* 206 U.S. 516, 27 S.Ct. 755, 51 L.Ed. 1163 (1907). Nor is any claim made on this motion that jurisdiction may be found on the basis that the warrant and arrest of the two vessels had a substantial, direct and foreseeable effect on the administration of this estate of exactly the type that 11 U.S.C. § 362(a) was designed to prevent. *See Bersch v. Drexel Fire-*

As to transactional or specific jurisdiction, *see Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984),

> A state has power to exercise judicial jurisdiction over a foreign corporation which does business in the state with respect to causes of action arising from the business done in the state.

*Restatement* § 47(1). As Judge Henry J. Friendly observed, this reflects the "modern [notion] that where a defendant has acted within a state … he may fairly be subjected to its judicial jurisdiction …" *Leasco,* 468 F.2d at 1340.

▐ Here it is clear that the defendant transacts business in the United States. It regularly affords, in the United States, quoted prices and terms for delivery of bunkers abroad. Agreements for the same are reached in the United States upon the acceptance of the quoted prices and terms. Its representative in the United States is apparently empowered to sign letters and to deliver documents on its behalf with respect to U.S. customers. It repeatedly holds itself out to the world as having an office in the United States.

It is also clear that the second half of the test, *i.e.,* that the cause of action asserted arose from business done here, has also been satisfied even though the acts complained of, the procuring of the Hong Kong warrant and the Singapore arrest, took place abroad. While the term "arising from" the business transacted in the state might convey the implication that the business transacted must itself give rise to the claim, the courts have construed the phrase far more broadly, holding, in effect, that the claim need only relate to that business in a general way. *See, e.g., CutCo Industries, Inc.,* at 367 (totality of acts in New York by California resident held to establish prima facie case of *in personam* juris-

diction under New York transaction of business statute, N.Y.Civ.Prac.Law § 302(a)(1) (McKinney 1984), similar to § 47(1) of the *Restatement* in action for breach of contract although breach occurred in California); *Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951 (2d Cir.1967) (contract negotiations in New York gave rise to jurisdiction over action for breach even though contract was to be performed and breach occurred elsewhere); *George Reiner & Co. Inc. v. Schwartz,* 41 N.Y.2d 648, 363 N.E.2d 551, 394 N.Y.S.2d 844 (1977) (contract negotiations in New York held to establish jurisdiction on transactional basis under N.Y. Civ.Prac.Law § 302(a)(1) for claim for breach of contract occurring in Massachusetts). All that has been required is a relationship between the underlying controversy and the forum state. A. von Mehren & D. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L. Rev. 1121, 1148–51 (1966). Consequently, the Supreme Court has recently taken to expressing the formula in terms of claims that "arise out of or relate to" forum business activities or activities directed at residents of the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985).[5]

Whether the forum contact and the cause of action are related can be explained in terms of relevance. L. Brilmayer, *How Contacts Count: Due Process Limitations on State Court Jurisdiction,* 1980 S.Ct.Rev. 77, 80–83 (1981). But limitation of the term to that necessary to assert a prima facie case on the merits, Brilmayer, 1980 S.Ct.Rev. at 82, is too narrow. Such a limitation does not accommodate those many cases such as *CutCo, Liquid Carriers,* and *George Reiner,* basing transactional jurisdiction over causes of action for breach of contract on the basis of negotia-

---

*stone, Inc.,* 519 F.2d 974, 1000 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Restatement,* § 50; *cf. Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 599, 71 S.Ct. 971, 975, 95 L.Ed. 1199 (1951). Those highly interesting issues are left to another day.

5. Thus, the Court has apparently resolved the relatedness issue left open in *Helicopteros,* 466 U.S. at 415 n. 10, 104 S.Ct. at 1872 n. 10.

tions in the forum. Especially in cases involving written contracts and therefore the potential application of the parole evidence rule, pre-contract negotiations would not normally be material to an action for breach. Those cases can be explained only in terms of historical connection. *See id.* at 83. That is, if the forum conduct relates to the subject matter at hand, the conduct suffices under a transactional test.

■ Here, both a strict relevance test and a historical connection test are satisfied. It is undisputed that the New Jersey agreements to obtain bunkers in Sharjah concerns the same subject matter, *i.e.*, the debts, upon which the Hong Kong and Singapore proceedings were based. Further, they are relevant to the cause of action asserted at least insofar as it is claimed that those proceedings are attempts to collect pre-petition debts. Those debts are the matters negotiated and agreed to in New Jersey and where consideration in the form of payment of antecedent debts was delivered. The defendant is thus subject to *in personam* jurisdiction here on those claims.

■ In addition, the factors listed by the Court in *Burger King* support the exercise of such jurisdiction and confirm that its assumption comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). The burden on defendant in litigating here, *Burger King*, 105 S.Ct. at 2184, is minimal; indeed the files pertaining to the transaction are located in New Jersey (Tr. at 23, 43–44) and it cannot be burdensome for defendant to litigate in the forum where they are located and where it represents that it has an office. Secondly, and most importantly, the forum state, here the United States, has a strong "interest in adjudicating the dispute." 105 S.Ct. at 2184. The dispute arises solely under its laws and concerns a vital protection provided by federal statute to those who seek to reorganize. Third, no irreconcilable "potential clash of [U.S.] law with the fundamental substantive social policy

of another State," *id.* at 2185, is presented. Fourth, GAC Marine asserted itself in New Jersey by demanding and receiving there in excess of $400,000 from the debtor in connection with these transactions. GAC Marine has thus enjoyed the protections and benefits of the laws of this country and is subject to jurisdiction here.

But even were it to be found that GAC Marine, like the defendant in *Burger King*, never came to the forum state, it, like that defendant, deliberately, through its parent and by itself reached out beyond its overseas location and negotiated with a United States company through use of the facilities of interstate commerce in New Jersey. Having chosen to so conduct its affairs, it cannot now complain that this forum is fortuitous or random. *Ibid; Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780, 104 S.Ct. 1473, 1481, 79 L.Ed.2d 790 (1984); *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

Furthermore, GAC's contention that it is not subject to jurisdiction under the general doing business test of § 47(2) of the *Restatement* is without merit. That section provides:

A state has power to exercise judicial jurisdiction over a foreign corporation which does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction.

Although the relationship between GAC Marine and GAC Shipping is apparently structured to enable GAC not to have bank accounts here, *see Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 260 N.Y. S.2d 625, 208 N.E.2d 439 (1965), it is nevertheless clear that the business of GAC in New Jersey is business done "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 115 N.E. 915 (1917). The seven to fifteen transactions per month negotiated in a fashion similar to the transactions at issue here, the receipt of checks in New Jersey,

the use of its letterhead by personnel located in New Jersey, the assertions of having a New Jersey office, all show GAC Marine's continued presence here. While GAC Marine claims that GAC Shipping lacks the power to confirm agreements, Schmidt's testimony that confirmations are rarely given from abroad and that the arrangements nevertheless proceed shows that such are not usually required or material.

It is beyond cavil that the mere presence of even a wholly owned subsidiary does not afford jurisdiction over the parent. *Restatement* § 52, Comment b. But

> [i]f a subsidiary corporation does an act, or causes effects, in the state at the direction of the parent corporation or in the course of the parent corporation's business, the state has judicial jurisdiction over the parent to the same extent that it would have if the parent had itself done the act or caused the effects.

*Ibid.* Accordingly, a corporate parent or affiliate is present for jurisdictional purposes not because of the affiliation but rather because of the intercorporate relationship which is characterized by services in the forum for the parent by the subsidiary beyond mere solicitation, and by frequent communication between them. *Boryk v. de Havilland Aircraft Co.*, 341 F.2d 666 (2d Cir.1965); *Scanapico v. Richmond Fredericksburg & Potomac R. Co.*, 439 F.2d 17 (2d Cir.1970) (en banc); *Tokyo Boeki (U.S.A.), Inc. v. S.S. Navarino*, 324 F.Supp. 361, 366 (S.D.N.Y.1971); *Delagi v. Volkswagenwerk AG of Wolfsburg, Germany*, 29 N.Y.2d 426, 431–32, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972); *Frummer v. Hilton Hotels Int'l., Inc.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). As stated in *Gelfand v. Tanner Motor Tours, Ltd.*,

> [A] foreign corporation is doing business in New York 'in the traditional sense' when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform

them, the corporation's own officials would undertake to perform substantially similar services.

385 F.2d at 121.

Thus, in *Frummer*, the court found general *in personam* jurisdiction over a London hotel through the acts of an affiliated corporation owned by the hotel's parent where the affiliate's purpose was to generate business for the hotel through soliciting business and confirming room reservations. GAC Shipping's conduct is similar: it handles GAC Marine's business in the United States. That it apparently lacks the formal power to confirm an agreement reached in this country is of no significance given the testimony that confirmation is of little moment in the conduct of GAC Marine's affairs. Far more than mere solicitation is GAC Shipping's role when it transmits GAC Marine's terms, collects checks for GAC Marine, delivers GAC Marine's invoices, pursues GAC Marine accounts and writes letters on GAC Marine's letterhead. GAC has its subsidiary perform services "sufficiently important to [it] that if it did not have a representative to perform them," its own officials would have returned "to perform substantially similar services." *Gelfand*, 385 F.2d at 121.

For these reasons, finding jurisdiction need not rely on GAC Marine's description of itself as having an office in New Jersey at the address occupied by GAC Shipping. But that it has so described itself makes clear what this record demonstrates: anyone wanting to do business with GAC Marine here need only telephone it in New Jersey by dialing the number it states on its letterhead and invoices.

## IV

We thus find that, with the debtor's success on the merits being virtually conceded on this motion and with its injury being, and deemed to be, irreparable, a preliminary injunction should issue since *in personam* jurisdiction is established. We further find that a contempt citation should issue since all that need be shown is a

knowing violation of the automatic stay. *Fidelity Mortgage,* 550 F.2d at 50–52. Although willfulness is not required in view of the remedial nature of the remedy, *e.g., Shillitani v. United States,* 384 U.S. at 368, 86 S.Ct. at 1534; *In re Damon,* 40 B.R. 367 (Bankr.S.D.N.Y.1984), the brazenness of GAC Marine's conduct makes that remedy particularly appropriate.

■ At bottom, the longstanding remedy of civil contempt "has quite properly been exercised for centuries to ensure compliance with judicial decrees." *Green v. United States,* 356 U.S. 165, 197, 78 S.Ct. 632, 650, 2 L.Ed.2d 672 (Black, J. dissenting). The decree is not to be punitive, but coercive. Application of that concept here leads to the imposition of a fairly heavy coercive measure. The willfulness of the defendant's conduct, its refusal to accept a warning and its express threat to continue, all warrant the imposition of an order fining defendant $5,000 for each day it fails to take the steps necessary to achieve withdrawal and vacature of the process issued in Hong Kong and Singapore. As noted at the hearing, that period started December 23, 1986, the day after the hearing, for the defendant required additional time to file a brief.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7012 and 7052. An order consistent with this Opinion is to be entered.